(Decided March 26th, 1896).

FREDERICK W. WOOD, Receiver of the Maryland Steel Co. *vs.* WILLIAM D. HEIGES.

*Master and Servant—Negligence—Liability of Master to Servant for Injury Caused by Dangerous Machinery—Evidence—Opinion of Witness as to Character of Machinery—Assuming Risks of Service.*

A master is not liable for an injury suffered by his servant in the course of his employment unless he has been guilty of some neglect of duty.    He is bound to exercise reasonable care in supplying proper machinery, but is not bound to provide machinery of any particular description, nor machinery like that used in certain other establishments.

Plaintiff, an employee in defendant's foundry, was ordered to do certain work at a point some thirty or forty feet distant from the place where defective iron castings were being broken by dropping upon them a heavy iron ball from the roof.    Before the ball was dropped, the foreman in charge of the work cried out a warning so that persons near might retreat and avoid the flying fragments of broken iron.    These, however, were never known to fly as far as twenty-five feet.    Defendant's appliance for breaking iron was in good condition, was operated by competent workmen and was constructed on the plan used in many other foundries.    Plaintiff had seen this work done for months before the day on which he was injured by a fragment which flew to an unprecedented distance and struck him.

He had been warned that the ball was about to drop and had had time to retreat to a greater distance if he deemed it safer.  *Held,*

1st. That there was no evidence of negligence on the part of the defendant.

2nd. That the plaintiff having accepted and continued in the employment with full knowledge of all the risks necessarily incident to the service, he must be considered as having assumed such risks.

Where the person operating the machinery by which the plaintiff was injured is a witness, and it is charged that the accident was owing to negligence in working the machinery, his skill as a workman is involved, and he may be asked what previous experience he had had in doing similar work.

A witness acquainted with machines like that by which plaintiff's injury was caused may testify as to whether the one in question was, in his opinion, safe or not.

Since the issue is whether the particular machinery by which plaintiff was injured was proper and suitable, it is not competent to ask a witness whether, if some particular precaution had been adopted, the injury would not have been inflicted.

Appeal from the Court of Common Pleas.  At the trial the first nine exceptions were all taken by the defendant to the action of the trial Court (HARLAN, C. J.) in allowing certain questions to be asked the witness, McAfee, who operated the "drop" machine by which the plaintiff was injured.  In the first exception, after describing the machine and the manner in which the plaintiff was struck on the elbow by a flying fragment of iron, the witness was asked if he had been previously employed in breaking scrap iron. He replied that he had done so on an electric crane.  He was then asked to explain what an electric crane was.  The Court overruled defendant's objection to this question and allowed the same to be answered.

The second exception was taken to the Court's permitting the same witness to be asked whether in his opinion the machine operated by him was a proper machine for breaking iron.  To this the witness answered that it "was constructed in a proper way, that is, it was constructed like other drops."

The third exception was to the overruling of the defen-

dant's objection to this question : "Was there the same pro-
tection about it as there was to these other drops ?" The
witness replied : "I never was in a foundry before ; this is
the only method I know of breaking iron in a foundry. The
scrap I seen broken was broken outside ; that is to say, in
open fields. They had a battery put up where the men that
pulled the rope and work the drop generally went into be-
fore they pulled the rope, that was for their protection. But
there were no other men around. That is the way the other
drops I have seen worked, but they wasn't in any foundry.
They were for the different steel works, and the scrap they
broke came from different parts of the steel works ; not
from the foundry, but from different parts."

In the fourth exception the witness was asked : "Would
the construction of such a battery about this structure have
made it a safe machine ?" To which the defendant's coun-
sel objected, but the Court overruled the objection and per-
mitted the question to be asked, and the witness replied :
"It would have been almost impossible to put a battery
around this machine. This battery I tell you about was put
only for the men that were operating the drop, and that drop
was out in the open field, you might say, and there was no
one else working around it except the men that were oper-
ating the drop itself, and the battery was put up for their
protection alone ; there were no other men to be protected.
I had nothing to do with operating those drops ; I had
nothing to do with them."

The fifth exception was taken to the permitting the same
witness to say whether, as an expert, he considered the
machine he was operating to be dangerous. The sixth and
seventh exceptions were taken to the rulings by which the
witness was allowed to say whether he considered the ma-
chine as dangerous for the men that worked about there.

In the eighth exception, the witness was asked if he con-
sidered the machine dangerous for a man within twenty-five
feet, to which he replied : " That would depend upon what
kind of scrap I was breaking, that is, if I was working on

heavy scrap; for myself, I would not be afraid of standing there, or afraid it would hit me; and if I was breaking light scrap, I wouldn't want the men to be standing too close." To the action of the Court in overruling the objection to the question and answer the defendant excepted.

In the ninth exception, the witness was asked: "Could there have been any construction put about the bed of this machine, about the ground where this breaking took place, any fenders or anything of that sort which would have protected the men from these flying pieces of iron?" To which the defendant's counsel objected, but the Court overruled the objection and permitted the question to be asked, and the witness replied: "It would have been difficult to do so on account of its being in the road of other work going on in the foundry; anything like that would be in the way of transportation going backwards and forwards, and it would be in the way of the moulders working there."

Those prayers of the plaintiff which were granted (except the one relating to the measure of damages) were as follows:

2nd. If the jury shall find from the evidence that the plaintiff was injured, as detailed in the evidence, while employed by the defendant in and about the foundry operated by the defendant; and that said injury was caused by the unsafe and dangerous condition of the machinery and appliances there used without any fault or negligence on the part of the plaintiff thereto contributing, and that said unsafe and dangerous condition of said machinery and appliances was or might have been known to the defendant by the use of due diligence, and could not have been known to the plaintiff by due diligence, then their verdict must be for the plaintiff. (*Granted*).

3rd. That if the jury shall find from the evidence that the plaintiff was employed by the defendant as a comon laborer in and about the foundry managed and controlled by the defendant at Sparrow's Point, and that the plaintiff, while so employed, was injured by a piece of iron being hurled upon him from an unsafe and dangerous machine operated in said

foundry ; that the unsafe and dangerous character of said machine was, or might have been known to the defendant by the use of due diligence, and that the plaintiff had nothing to do with the construction or operation of said machine, and did not know, and by the exercise of ordinary care could not have known, of its unsafe or dangerous character, then their verdict must be for the plaintiff, unless they find that the plaintiff contributed to his injury by the want of ordinary care and prudence. (*Granted*).

The defendant offered the following prayers, all of which except the eighth were rejected.

*Defendant's 3rd Prayer.*—The defendant prays the Court to instruct the jury that there is no evidence in the case of any such negligence on the part of the defendant in discharge of its legal obligations to the plaintiff as would entitle him to recover in this action. (*Refused*).

*Defendant's 4th Prayer.*—That if the jury find from the evidence in this case that the plaintiff, at the time and place when and where he suffered the injury complained of, was in the employ of the defendant, and that said injury was caused and owing to the negligence of another servant or servants of the defendant, the plaintiff cannot recover unless he shall satisfy the jury that in selecting the servant or servants, through whose negligence the accident occurred, the defendant did not use due care and ordinary prudence in procuring faithful and competent servants ; and further, that in this case the plaintiff has offered no evidence from which the jury may find that the defendant did not use such care in the selection of said servants, and therefore their verdict must be for the defendant. (*Refused*).

*Defendant's 5th Prayer.*—The jury are instructed that the undisputed evidence in this cause shows that there was no want of ordinary care on the part of the defendant in the discharge of his legal obligations to the plaintiff, and the verdict must be for the defendant. (*Refused*).

*Defendant's 6th Prayer.*—The jury are instructed that under the testimony in this case the machinery and applian-

ces in use by the defendant were such as were in ordinary use, and it cannot be held responsible, because it failed to use some other or different kind, and their verdict must be for the defendant. (*Refused*).

*Defendant's 7th Prayer.*——The jury are instructed that the defendant was not bound to use the newest, safest or best machinery or appliances, and it is not liable for negligence for not having any device around the machinery which caused the accident, and their verdict must be for the defendant. (*Refused*).

*Defendant's 8th Prayer.*—That if the jury find from the evidence that the plaintiff, by reasonable care and caution, could have avoided the piece of iron which caused the accident, that then he cannot recover. (*Granted*).

*Defendant's 9th Prayer.*—The jury are instructed that if they believe the accident was caused by the negligence of the fellow servants of the plaintiff, then he is not entitled to recover, and they are further instructed that Grafton and McAfee were both fellow servants of the plaintiff. (*Granted*).

The defendant specially excepted to the granting of the plaintiff's second prayer, because there is no evidence of the defective and dangerous condition of the machinery and appliances used in the place where the accident happened. And to the granting of the third prayer, because there is no evidence of the dangerous and unsafe character of the machinery used by the defendant.

The jury returned a verdict for the plaintiff for $2,500, and from the judgment thereon the defendant appealed.

The cause was argued before McSHERRY, C. J., BRYAN, FOWLER, BRISCOE, PAGE and BOYD, JJ.

*Alexander Preston* (with whom were *J. Alex. Preston* and *Robert Ludlow Preston* on the brief), for the appellant.

The testimony in the second, fifth, sixth, seventh and eighth exceptions was offered to show that in the witness' *opinion* the machine was dangerous, and consequently there

was negligence in using it on the part of the appellant. His opinion, it was contended, was admissible, because he was an expert. But his *opinion* was and only could be drawn from the *facts* already before the jury ; whether or not an act is negligence is not a matter for expert testimony, but of judgment and common experience, except in some cases involving skill, and should be determined by the jury upon facts and circumstances ; a witness' *opinion* cannot be substituted for that of a jury ; expert testimony cannot be given where the facts are plain, and the jury can determine from them whether or not they constitute negligence ; indeed the jury are empannelled for the express purpose of forming an opinion from the facts, and there was nothing in the facts of this case to prevent the jury from deciding this case on the presentation of the circumstances of the injury. In numerous cases it has been decided that it was error, and reversible error, to allow opinions of experts to be given in cases like this one. *Bailey's Master Liability to Servant for Injuries,* 531 ; *B. & Y. R. R.* v. *Crowther,* 63 Md. 569 ; *Bergquist* v. *Chandler Plow Co.,* 49 Minn. 511 ; *Lawson* v. *C. St. Paul, M. & O. R. R. Co.,* 64 Wis. 447 ; *Kaufman* v. *Maier,* 94 Cal. 269 ; *Freeburg* v. *St. Paul Plow Works,* 48 Minn. 99 ; *Seese* v. *N. P. R. R. Co.,* 39 Fed. Reports, 487 ; *Gerbig* v. *N. Y., L. E. & W. R. R.,* 69 Hun, 174 ; *Overby* v. *C. & O. R. R.,* 27 W. Va. 524.

As to the ninth exception. Negligence is not established by showing that the injury might possibly have been prevented. *Gilbert* v. *Gould,* 144 Mass. 605.

The evidence offered on behalf of the appellant (which was undisputed), by the witness, P. Hines, showed that the method here used in breaking iron was the method in universal use ; he had seen it used under precisely similar circumstances as the facts in this case, in Chambersburg, in Westminster, in Baltimore, in Pittsburg, in short, *all over the country,* for a period of nineteen years ; he had never known of any accident to happen. A review of the testimony fails, it is respectfully submitted, to show a want of

ordinary care on the part of the employer in the discharge
of his legal obligations to the appellee.    There is no pre-
tence that the appliances were defective in any way; there
is no evidence of negligence in carrying on this particular
business in the way that it was; on the contrary, it is proved
by undisputed testimony that the method employed here,
the warning used, if warning was necessary, was that used
in all foundries.    The appellee says, that he did not know
of any danger from this machine, neither did anyone else;
his knowledge was quite equal to that of every one there.
McAfee saw him before he pulled the drop.    McAfee, who
knew more about this machine than anyone else, evidently
regarded the appellee as being in a perfectly safe place; to
say that an employee must be warned of danger, means
nothing more than that he must not be put to work on
dangerous machinery without the knowledge of the danger;
but in a large foundry, where machinery of many varieties,
railroads being operated, &c., to say that it is necessary to
warn every employee of every possible danger from acci-
dent, is to say that the employer must be an insurer of his
workmen, and the only escape from liability is for him to be
endowed with powers of divination.    In large manufac-
turing establishments in which various and complicated
machinery is constantly in use, workmen are continually
in danger, as one of the witnesses most pertinently re-
marks, a man is always in danger there, and the further
away he is from any machinery the safer he will be.
The master performs his duty when he furnishes appli-
ances, etc., of ordinary character and reasonable safety, and
the former is the test of the latter, for in regard to the style
of implement, or nature or mode of any work, ' reasonably
safe,' means safe according to the usages, habits and ordi-
nary risks of the business.    Absolute safety is unattainable,
and employers are not insurers.    They are liable for the con-
sequences, *not of danger, but of negligence;* and the unbend-
ing test of negligence in methods, machinery and appliances,
is the ordinary usage of the business.    No man is held by

law to a higher degree of skill than the fair average of his
profession or trade, and the standard of due care is the con-
duct of the average prudent man.    *Titus* v. *Bradford, &c.,
R. Co.,* 136 Pa. St. 626.    See also *Ship Bld. Works* v. *Nut-
tall,* 119 Pa. St. 149 ; *Wonder's case,* 32 Md. 411 ; *Hayden*
v. *Mfg. Co.,* 29 Conn. 558 ; *Hickey* v. *Taafe,* 105 N. Y. 34 ;
*Baulic* v. *N. Y., &c., R. Co.,* 59 N. Y. 356 ; *Saxton* v. *Hawks-
worth,* 26 L. T. N. S. 851 ; *Steffen* v. *C. & N. R. Co.,* 45
Wis. 259 ; *Sjogren* v. *Hall,* 53 Mich. 274 ; *Trotter's case,* 61
Mich. 419 ; *State* v. *Malster,* 57 Md. 309.

*Charles E. Hill,* for the appellee, cited : *Turnpike Road* v.
*Crowther,* 63 Md. 568 ; *County Comrs.* v. *Wise,* 71 Md. 54 ;
*Balto. Elevator Co.* v. *Neal,* 65 Md. 452 ; *Turnpike Road* v.
*Leonhardt,* 66 Md. 77 ; *Rogers, Expert Testimony,* 259 ; *C.
& P. R. Co.* v. *Moran,* 44 Md. 293 ; *State* v. *Malster,* 57 Md.
287 ; *Iron Ship Bldg. Works* v. *Nuttall,* 119 Pa. St. 158 ;
*Beven on Negligence,* 740, 803 ; *Wise* v. *Ackerman,* 76 Md.
389 ; *Peoples' Bank* v. *Morgolofski,* 75 Md. 432.

PAGE, J., delivered the opinion of the Court.

This action was brought by the appellee to recover dam-
ages for injuries sustained in the works of the Maryland
Steel Company, while engaged in the service of the receiver
of that concern.    He entered upon his employment about
the thirteenth day of January, eighteen hundred and ninety-
four, as a moulder and general laborer.    On the 29th of
March following he was ordered by his foreman to clean
certain castings on a car-truck, used for transferring material
from place to place in the foundry.    It was then located
from twenty-five to thirty feet distant from an appliance then
being used by other workmen in breaking up defective cast-
ings.    This appliance consisted of an arrangement by which
an heavy iron ball, weighing seventeen or eighteen hundred
pounds, could be hoisted to the roof of the building and
dropped upon the castings beneath.    From a drum (revolved
by a crab-engine), a rope passed through a pulley fixed in

the comb of the roof. The ball was attached to the end of this rope, and when at the proper height it was dropped by means of a smaller rope, connecting with a device for tripping the fastening that sustained it. The castings to be broken were sometimes very large, measuring eight feet in height and weighing seven or eight tons. On the day of the accident, the castings rested on pieces of " core-bars," placed on the floor, for sake of greater solidity. When it was proposed to strike the casting at a particular point the ball would be swung a little, and while still swinging, it would be dropped, so as to fall upon the desired spot. The effect of the impact of the heavy ball upon the casting was to break it ; and (to use the language of the witness, McAfee) to cause the pieces to " jump up   *   *   in a circle around the drop of about ten feet, and of course that was sacred ground." None of the witnesses, however, had ever seen the fragments fly so far as the place where the appellee was standing when injured. This particular drop had been in operation about two weeks. Before its erection the method of breaking castings was the same, except that instead of a fixed hook in the comb of the roof, a travelling crane was used to hoist the ball. Workmen engaged near the drop were always notified when the ball was about to be dropped by the stoppage of the engine, and by the warning voice of McAfee, who always before he pulled the rope, cried in a loud voice, "heads up" or "lookout." These warnings were given to the appellee, and if he heard them he had time to move to a safer distance had he desired to do so. The appellee's account of the accident is that while he was at work on the casting, 25, 30 or 40 feet from the drop, " he heard a voice, and raised up from a stooping position, and saw a small piece of iron fly up from where they were breaking iron ;   *   *   after a time he heard a voice again and raised up again, and as he raised a man pulled the drop, and a piece of iron flew towards him ;" he tried to get away but could not ; a cylinder head was on his right, a car-truck in front, and behind him, six or eight feet, an hydraulic plunger. He

never thought of danger. He had worked in the foundry "most of the time" from January until then; he had never seen a piece of iron fly so far before. He had seen the drop worked before, and when it was first put in, he in common with everyone else, had looked to see what impression it would make on the ingot mould about to be broken. Much testimony from other witnesses was offered to explain the machinery of the drop, the effect upon the castings, and also the details of the accident. There was also proof to the effect that iron was broken upon the same principle in foundries at Chambersburg and Westminster and other places; and there was a description of a breaking machine with a battery about it for the protection of workmen, used in a steel works in Pennsylvania.

Upon this evidence the Court submitted it to the jury to determine whether the injury was caused, without fault of the plaintiff, by the unsafe and dangerous condition of the machinery and appliances, which was, or by the use of due diligence could have been, known to the defendants; and if they so found, instructed them to bring in their verdict for the plaintiff. The defendant excepted specially to this instruction, because there was no evidence of the unsafe, dangerous or defective character or condition of the machinery.

It was not contended either in this Court or below that the drop machine was not in perfect condition, or that it was not operated by a thoroughly skillful workman. But it was insisted that the machine was dangerous and unsafe, and that the appellant should have provided additional protection to those whose duty it became to work in its vicinity.

The liabilities of the master to his employee have been considered by this Court in too many cases to require here more than a statement of the general principles applicable to the subject. When a servant engages to perform certain services for a compensation, it is implied as a part of the contract, that, as between himself and his employer, he assumes all the risks incident to the service. And these risks include such as arise, from the hazardous character of

the service, and from the negligence of other servants in the same employment, even though they may be in a different grade. But the master himself is bound to use ordinary (that is due and reasonable) care and diligence to provide proper materials and appliances to do the work, and in the selection and employment of competent and careful fellow servants. In addition to this, the master cannot negligently expose the servant to such extraordinary perils in the course of the employment that the servant from the want of knowledge, skill or physical ability, cannot by ordinary care and prudence, under all the circumstances of the case, guard himself against them. *State use Hamelin* v. *Malster & Reany*, 57 Md. 307. Yet, while the master is thus bound to protect his employees, there is no contract obligation imposed upon him to provide machinery of any particular description; his obligation extends no further than to require him to use that care which ordinary prudence and the exigencies of the situation demand in providing the servant with machinery or other instrumentalities safe for use by him. *Hough* v. *Texas & P. R. R. Co.*, 10 Otto, 213.

If a servant has knowledge of the circumstances under which the employer carries on his business and chooses to accept the employment, or continue in it, he assumes such risks incident to the discharge of his duties as are open or obvious. In such cases it is not a question whether the place prepared for him to occupy, and which he assents to accept, might, with reasonable care, have been made more safe. His assent dispenses with the performance on the part of the master of the duty to make it so. *State use Hamelin* v. *Malster & Reany, supra; Wonder's case*, 32 Md. 416; *Stricker's case*, 51 Md. 47; *B. & P. R. R.* v. *State*, 75 Md. 161. Where, however, the risks to which the servant is subjected are such, as he had no reason to believe, from the nature of his employment, he would have to encounter, and such risks arise from causes hidden or secret, or such as would reasonably escape his observation, the master is bound to notify his servant, provided he himself

knew or by the exercise of ordinary care ought to have known of them. *Saxton* v. *Hawksworth*, 26 L. T. N. S. 351; *U. P. R. R. Co.* v. *Fort*, 84 U. S. 213; *Sjogren* v. *Hall*, 53 Mich. 274; *Clark* v. *Railroad Co.*, 28 Minn. 128; *Shipbuilding Works* v. *Nuttal*, 119 Pa. St. 149.

The master is, therefore, not an insurer of the servant's safety. He cannot be bound for his servant's injury, without being chargeable with some neglect of duty, measured by the standard of ordinary care. On the other hand, the servant is under an obligation to provide for his own safety when danger is either known to him or discoverable by the exercise of ordinary care. " He must take ordinary care to learn the dangers which are likely to beset him ; " (*Beach on Contrib. Neg.*, sec. 138), and where the servant is as well acquainted as the master with the dangerous nature of the instrument used he cannot recover. *Beach on Contrib. Neg.*, sec. 140; *Wheeler* v. *Mason Man. Co.*, 135 Mass. 298.

In the case at bar the appliance used for the breaking of castings was in perfect condition and operated by a competent and skillful person. It was constructed on the plan adopted and used in other foundries. In all their experience in operating it, none of the witnesses had ever seen pieces fly so far before. Heiges had seen the breaking of castings with the crane, for more than two months. He had witnessed the construction of the "drop," had watched the ball hoisted to the roof, and had observed what impression was made on the ingot to be broken. For two weeks he had been a daily witness of the process, and presumably being a person of average intelligence, must have known, as well as any one, the risks and dangers attending its use. He did not know that pieces of iron would fly twenty-five feet, nor did any one. He received two warnings that the ball was about to drop—once, when the engine stopped, and again when McAfee cried out " heads up." Either warning was in time to enable him to retreat to a greater distance, and though the cylinder-head was on his right, the car-truck in front and an hydraulic plunger six or eight

feet behind him, the proof establishes the fact, there was a clear way still open to him.　Now, despite his knowledge of the machine, its effect upon the castings, and his double warning, either through inattention, or carelessness, or a feeling of security, he merely raised himself up.　Then the unexpected happened; he saw the iron flying towards him; it was too late to avert the danger, and he was injured. With our view of the law, as stated, we can perceive here no evidence of neglect on the part of the receiver.　He employed " due and reasonable dilligence, having respect to the nature of service, to provide proper materials, appliances and instrumentalities for doing the work," and to select competent and skillful persons to manage them.

But apart from this, we are of opinion there is another ground upon which the plaintiff is not entitled to recover. He accepted employment to work in the foundry, with a full knowledge of all the circumstances under which the business was conducted, and continued in it after the " drop " was put up.　His duty was that of a moulder, chipper of castings and general laborer.　Such duty required him to work in all parts of the foundry.　On the particular occasion, when he was injured, he accepted the position assigned him to discharge an ordinary duty, within the scope of his employment, with a full knowledge of all its surroundings and dangers, without remonstrance; and having done so, " he must abide the consequences, so far as any claim against the employer is concerned."　*Malster's case, supra; B. & O. R. R. Co.* v. *Stricker,* 51 Md. 47.

From what we have said it follows that there was error in granting the second and third prayers of the plaintiff, and in rejecting the defendant's third, fifth, seventh and eighth prayers.　By the granting of his ninth prayer the defendant received the substantial benefit of the principle embodied in his fourth.

There was no error in the first exception.　The *narr.* by the second count charged that the accident was due to " gross negligence in the working of the machinery," &c.

McAfee was the operator of the machine.    His competency thus became involved in the issues of the case.    He had just stated he had broken scrap on an electric crane.    The question was, therefore, calculated to elicit testimony which would show what had been his experience ; from which, in connection with other evidence, the jury could form some opinion as to his competency to operate the drop.

The question and answers contained in the 2nd, 4th, 5th, 6th, 7th and 8th exceptions were properly allowed. Whether the machine was safe or not was a matter requiring special skill, knowledge and experience, and McAfee had already been shown to be one whose experience had made him familiar with the matter.    *President, &c.,* v. *Leonhardt,* 66 Md. 77 and 78.

The interrogatories excepted to in the third and ninth exceptions, we think, were improperly allowed.    It has already been said that the master is not obliged to provide machinery similar to that used in other establishments, though that may be less dangerous.    The issue was whether the particular machinery was proper and suitable ; and that was to be determined by its actual condition, and not by comparing it with other machines.    *Crowther's case,* 63 Md. 569.

*Judgment reversed without a new trial.*

(Decided March 26th, 1896.)