# THE MARYLAND TELEPHONE AND TELEGRAPH CO. *vs.* CHARLES W. CLOMAN.

*Negligence—Master and Servant—Breaking of Cross-arm on Telephone Pole Injuring Employee Seated Thereon—Withdrawing Case From Jury.*

While plaintiff was sitting on a cross-arm fastened to a telephone pole of the defendant company and occupied in tightening the wire previously strung on the pole, the cross-arm broke, throwing plaintiff to the ground and causing the injury for which this action was brought.   The cross-arm was about 10 ft. long, 4 inches thick, and had 10 holes bored in it a foot apart and 1½ inches in diameter in which were inserted the pins supporting the insulators.   After the accident it was discovered that the cross-arm broke because one of the holes had been bored near a knot in the wood.   This defect was not visible upon inspection, the knot being obscured by paint.   The plaintiff's evidence showed that the defendant company purchased its cross-arms already painted and with the holes bored in them by machinery; that the cross-arm which broke was similar to those used by other telephone companies for the same purpose; that it was very unusual for a cross-arm to break except in consequence of a storm, and that the arms supplied to them were open to the inspection of defendant's employees.   There was no evidence that any test which could have been employed would have disclosed the defect which caused this particular arm to break.   *Held*, that since there is no evidence of any negligence on the part of the defendant in the purchase or use of this cross-arm, or in failing to dis-

cover the hidden defect, and since the plaintiff assumed the risks inci-
dent to his employment against which defendant's reasonable care
could not protect him, the jury should have been instructed that the
plaintiff is not entitled to recover.

*Held*, further, that since the plaintiff's own witnesses explained the
nature and cause of the accident, it was not necessary for the defend-
ant to offer any testimony before asking the Court to withdraw the case
from the jury.

Appeal from the Circuit Court for Baltimore County,
(Burke, J.)

*Defendant's 12th Prayer.*—That under the evidence in this
case no higher degree of care was required of the defendant
company in inspecting the cross-arm in question before send-
ing it out to be put on its poles than was required of the
plaintiff before going out upon said cross-arm to work, and
if the jury believe that the knot in said cross-arm was the
immediate and proximate cause of the injury and that the
plaintiff looked for said defect and did not see it because it
was covered up with paint, and shall further believe from the
evidence that said cross-arm was covered up with paint to the
same extent when it was purchased by the defendant com-
pany and sent out by it for use at Towson, then under the
pleadings and evidence in this case the plaintiff cannot re-
cover. (*Granted.*)

The cause was argued before McSherry, C. J., Fowler,
Briscoe, Page, Boyd, Pearce and Schmucker, JJ.

*William L. Marbury* and *Osborne I. Yellott* (with whom was
*T. S. Offutt* on the brief ), for the appellant.

*Frank I. Duncan*, for the appellee.

Boyd, J., delivered the opinion of the Court.

The appellee sued the appellant for injuries sustained by
him while engaged in stringing wires on the telephone poles
of the company, and recovered a judgment for three thous-
and dollars damages.  He had been employed in similar work
for the Chesapeake and Potomac Company for about nine

months.    At the time of the accident, he and another em-
ployee, named Uhler, were stretching ten wires on a cross-arm
with what are called "jack straps," there being five wires on
each side of the pole.    The cross-arm was made of wood and
was about ten feet long, three and a quarter inches wide,
and four inches thick.    There were ten holes bored in it about
a foot apart, and one and one-half inches in diameter, in
which wooden pins were inserted to hold the insulators for the
wires.    The arm was fastened to the pole by a bolt, was sup-
ported by braces on either side of the pole, and was about
thirty-five feet from the ground.    At the time of the accident
the appellee was sitting on the cross-arm with his feet resting
on the lower arm, upon which wires had not been stretched.
He was towards the outer end of the arm, and was working
with the strap around the third pin when the arm broke,
throwing him down and seriously injuring him.    The appellee
stated that he could not say exactly at what point the arm
broke, but it was on the side he was sitting and one of his
witnesses said he thought it was at the fourth pin from the
end and another that it was at the third or fourth.

The defendant offered no testimony.    There are eighteen
bills of exception in the record—seventeen of which present
the rulings of the Court on the admissibility of testimony
offered, and the last embraces the prayers.    Two prayers were
offered by the plaintiff, which were granted, and twenty were
offered by the defendant, twelve of which were rejected, one
conceded and the remaining seven granted.    Under the view
we take of the case it will not be necessary to consider all of
the exceptions.

It cannot be doubted that a knot, which was discovered
after the accident, in the cross-arm at a point where one of the
holes was bored, was, at least to some extent, the cause of
the accident, but the responsibility of the appellant must de-
pend upon the further question whether it was negligent in
furnishing the cross-arm with such defect in it.    It must be
admitted that there was no apparent defect in the arm, and it
is well established by the testimony that the knot was not vis-

ible by any ordinary inspection. The plaintiff testified that he did not notice anything about it that indicated it was not safe, and that it looked very similar to the creosote bars he had been accustomed to, while working for the Chesapeake and Potomac Company, which used creosote and red painted white pine arms. The former he said weighed from seventy-five to one hundred pounds, while the latter were much lighter. The arm that broke had been put on the pole the day before the plaintiff was injured, by some of the other employees. He said "The wires in question were thought to have been permanently deadened before he went up the pole, that they were fastened to the insulators, but it was found that they were not pulled hard enough, and he and Uhler went up to take up the remaining slack. They had to unfasten them and re-deaden them. The jack straps were used to take in slack which could not be taken in by hand pull." When the wires are spoken of as being "deadened," it is meant that they did not go beyond that pole, but were fastened to that arm.

In determining whether the appellant is responsible it will be well to first ascertain the character of the cross-arms furnished by it to its employees, the opportunities which its agents had to be assured that they were safe, what they actually did in that respect, and the use the appellee was making of this particular one at the time of the accident. Charles F. Knox, who was " gang foreman " of the plaintiff and the other linemen engaged in the work, testified he was sent by the company to take charge of this construction work at Towson, that " He went to the company and asked them what material he was to use in the work, and was told to use the material then on the ground, the cross-arm which broke being one of those already in the work, on the pole." Joseph S. Caskey said he was at the time of the accident " head assistant to Mr. Holliday, the material boss," who, the record shows, was reported sick the day before Caskey testified. The " material boss " had full charge of all materials and saw that the men received bolts, cross-arms, screw-drivers, wrenches and other things they needed. Caskey testified that

the cross-arm which broke came from their supplies—was sent from their High street yard.   He examined it after the accident and said that the knot was not visible before the arm was broken—that the paint obscured it and in answer to the question whether the paint or creosote, whichever it was, was on when it came into the possession of the company, replied " It was on it when it came into the possession of the company to the best of my knowledge."   The question being in substance repeated he said " I saw the arms when they came in there.   They were painted to the best of my knowledge." He also said " The holes came also in them when they were purchased."   Mr. Knox also testified " that the knot referred to weakened the $\frac{7}{8}$ inch strip by the pin, but said it was not the mistake of the man who bored the hole next to the knot, as all ten holes were bored at the same time by machinery, that the knot was not visible to the plaintiff when he went up on the arm, because it was painted, that it could have been seen on two sides if the paint had been removed, that knots in wood were an uncommon thing sometimes.   He further testified that he never knew a cross-arm to break except when broken by storms."   In answer to the question how this arm compared in size and quality with the ordinary cross-arms that are used in the telephone business for the construction of lines, he said " In size I think it was about the regular size. I didn't notice any difference in them, they were light in weight, very much like the regular old style red arm, about the same weight."   He also testified " that the arms referred to were much lighter in weight than the creosote arm, but as to quality a good red arm would be as good as a creosote arm, the arms in use by the defendant company being lighter than the creosote arms," and " that all cross-arms were bored similar to those used by the defendant company, though some had small iron pins in them, but such were not generally used."   It is true that he said that this particular arm was not in his opinion safe for the purpose it was sent there, but he explained that by saying that he thought it was not safe by reason of the knot being where the hole was bored, which

weakened it, and Caskey spoke of the wood as inferior—called it a " culling "—but he ascertained that from his examination of the arm after it was broken.

It must be remembered that all the testimony offered was produced by the plaintiff and that both Knox and Caskey were in positions to know the facts and, as we understand the record neither of them was in the employ of the defendant when they testified—they certainly showed no bias in favor of the company.   In addition to what we have already referred to, it is shown that there were other cross-arms at hand, that the lineman could get them as desired, and a witness, Archer, said " the arms used by the defendants on its work at Towson, were about the same size as those used by the Chesapeake and Potomac Company."   There is nothing whatever to indicate that the defendant did not procure its cross-arms as other companies do, and it cannot be said from anything we have found in the record that there was any negligence on the part of the defendant in the purchase, selection or use of this cross-arm, or that there was any apparent difference in its construction or weight from those in use by other telephone companies.   As we have seen, it was proven by the plaintiff, that the knot was concealed by reason of the paint, and it was not shown that it is not customary for such companies to purchase arms already painted and with the holes already bored.   It would hold a telephone or other company using such arms to a very unreasonable responsibility to say that it was negligent in purchasing arms in that condition, especially when the evidence shows, as it does here, that it is so unusual for them to break, excepting as the result of storms, and it is probable that age and use tend to weaken them so as to cause them to break under those circumstances.   But these arms were not only handled at the yard, but the men putting them on the poles had an opportunity to examine them, and those who string the wires can to some extent test them before putting their weight on them. In this instance it is shown that this arm was fastened to the pole the day before the accident, and wires were actually stretched on it and it did not then break.   Nor did it break

with the lineman Uhler who was at work with the plaintiff on the other side of the pole. There would seem therefore to be no doubt, that it broke by reason of the knot being at one of the holes and the great strain it was subjected to by the weight of the plaintiff and the use of a jack strap, which en-abled him to exert so much more power than he could have done with his hands.

Courts naturally and properly hesitate to withdraw cases from the consideration of the jury, which is the tribunal under our system to pass on facts, but when all the testimony in the case is offered by the plaintiff and it establishes facts that pre-clude a recovery, it is the duty of the Court to so instruct the jury, when requested, and we think there was error in the court below in not doing so in this instance. It did instruct them that if they found the facts in the 12th prayer, the plain-tiff could not recover, and although the plaintiff and his wit-nesses proved every fact therein submitted, the jury found for the plaintiff. The only thing there mentioned that could be said to be at all in doubt, under the evidence, was whether the jury believed the knot was the immediate and proximate cause of the injury. If they found in the negative, then un-questionably the defendant could not be held liable, for there was nothing else to base the claim of negligence on, and if they found in the affirmative, they were instructed to return a verdict for the defendant. We refer to this to illustrate the danger of a jury being allowed to conjecture or speculate. If this defendant is to be held liable, then it must be because some one of its agents did not detect a defect which all the testimony of the plaintiff, including his own, tends to show could not be detected by any means that are shown to be used in the kind of work the defendant is engaged in. If there be any test which might and ought to have been used, which would have disclosed the defect, the plaintiff should have so proved, but, in the absence of such proof, the jury was not at liberty to assume that there was and to speculate on the subject.

For the sake of humanity, and for the protection of those

who are required to occupy perilous positions, in order to gain a livelihood, and have no means for the protection of themselves, employers should not be permitted to trifle with the safety of their employees, or for the sake of dollars and cents withhold from them such safeguards as can be reasonably demanded of them, but the law does not exact of them unreasonable care and caution and does not make them insurers of their employees' safety. As was said in *Wood* v. *Heighes*, 83 Md. 267, and repeated in *South Baltimore Car Works* v. *Schaeffer*, 96 Md. 88. "When a servant engages to perform certain services for a compensation, it is implied as a part of the contract that, as between himself and his employer, he assumes all the risks incident to the service. And these risks include such as arise from the hazardous character of the service, and from the negligence of other servants in the same employment, even though they may be in a different grade. But the master himself is bound to use ordinary (that is due and reasonable) care and diligence to provide proper materials and appliances to do the work, and in the selection and employment of competent and careful fellow servants." In the latter case in which an employee was injured by a knife flying from a moulding machine, which was alleged to have been caused by defective bolts, we said "It is obvious, therefore, that the plaintiff must not only show that he was injured because the bolts were defective, but he must go one step further, and offer evidence legally sufficient to show that the defendant did not use reasonable care in procuring proper bolts for the adjustment of the knife."

The appellee seeks to distinguish this from *Schaeffer's case* because in the latter the defendant placed witnesses on the stand to explain the breaking of the bolts, as well as it could, while in this case it did not call any witnesses. But it must be remembered that the plaintiff himself called those who were apparently most familiar with the steps taken by the company—excepting perhaps Mr. Holliday, who the record shows had been reported sick. In addition to that the plaintiff's testimony furnished all the explanations that we have any

right to infer could be made, and established such facts as negatived the probability of being able to discover such a defect as caused this accident by any inspection that could be reasonably required. When a plaintiff proves such circumstances as furnish *prima facie* evidence of negligence on the part of the defendant, the law requires him to explain them, but when the plaintiff himself furnishes that explanation, there is no occasion for the defendant doing so. This plaintiff not only attempted to show that the arm broke by reason of this defect in it, but established beyond all controversy that the defect was not visible and that such was the case when the defendant purchased the arm. If it was possible to discover the defect by some customary method of inspection that was not used, then the plaintiff should have established that fact. As was said in *Schaefer's case*, "It was the duty of the plaintiff, if he relied on failure to inspect, to have offered some testimony which would have justified the jury in finding that the defect causing the injury was one which could have been discovered by the usual and ordinary methods of inspection, commonly adopted by those in the same kind of business which was conducted by the defendant."

So without discussing the alleged contributory negligence on the part of the plaintiff, and other questions presented by the record, we are of the opinion that the case should have been withdrawn from the jury because the plaintiff failed to establish any legally sufficient evidence of negligence on the part of the defendant, and as the plaintiff cannot recover, it would be useless to remand the case.

> *Judgment reversed, without awarding a new trial, the costs to be paid by the appellee.*

(Decided July 1st, 1903.)