IN THE

# SUPREME COURT OF TENNESSEE

FOR THE

EASTERN DIVISION.

KNOXVILLE, SEPTEMBER TERM, 1916.

LIVELY *v.* AMERICAN ZINC CO. OF TENNESSEE.

(*Knoxville.* September Term, 1916.)

1. MASTER AND SERVANT. Safe appliances in mines. Statute. Duty of master.

The duty to comply with specific provisions of a statute designed as precautions against accidents and injuries in the use of a mine elevator is absolute, and is not satisfied by mere approximation or the exercise of reasonable diligence or ordinary care in an effort to comply therewith. *(Post, pp.* 261-267.)

Cases cited and approved: Deserant v. Cerillos Coal Co., 178 U. S., 410; Chicago, B. & D. R. Co. v. United States, 220 U. S., 557; McDaniels v. Rogle Mining Co., 110 Mo. App., 706; Little v. Norton Coal Co., 83 Kan., 232.

2. STATUTES. Construction. Words. Common-law meaning.

When a term having a well-recognized meaning in the common law is used in a statute, that meaning will be given it in construing the statute, unless a different sense is apparent from the context or the general purpose of the statute. (*Post pp.* 267-270.)

261

Cases cited and approved: Horne v. Memphis & Ohio R. R. Co., 41 Tenn., 72; State v. Cooper, 120 Tenn., 549; State v. Watkins, 123 Tenn., 502; Davis v. N. W. Ry. Co., 75 S. C., 303; Wall v. Marshutz & Cantrell, 138 Cal., 522; Reed v. M., K. & T. Ry. Co., 94 Mo. App., 371; Titus v. Bradford, B. & K. R. Co., 136 Pa. 618.

Cases cited and distinguished: Morriss Bros. v. Bowers, 105 Tenn., 59; Gray v. Washington Power Co., 30 Wash., 665.

3. **MASTER AND SERVANT.** Statutes. Derogation of common law. Construction.

Where the word "safe" in Acts 1915, chapter 169, section 27, which makes it the duty of a mine owner to make appliances safe, is closely followed by special provisions looking to safety, the statute will be construed to intend that the result shall be attained by the use of those terms so far as they extend, and as to points not covered the common-law signification of the word will control. (*Post, pp.* 267-270.)

4. **MASTER AND SERVANT.** Safe appliances in mines. Statute. Construction. "Safe." "Reasonably safe." "Available."

Under Acts 1915, chapter 169, section 27, providing that employees in mines shall be lowered into and out of a mine by machinery, and that the escapement shaft shall be fitted with "safe and available" machinery, and that the hoisting machinery used for lowering employees into and out of the mine shall be kept in a safe condition, followed by specific provisions prescribing precautions to be taken, the word "available" means "suitable" or "usable," and the word "safe" means "reasonably safe" within the meaning of the law, requiring only such tools and appliances as are in general use among employers of ordinary caution and prudence in the same line of business under the same circumstances. (*Post, p.* 270.)

5. **MASTER AND SERVANT.** Safe appliances in mines. Statute. Instruction.

Where a statute requires mine owner to use such reasonably safe machinery as is in general use in such business, he may choose between different types of machinery in such general use, and is not liable because some other style than that adopted by him may be found safer. (*Post, pp.* 270-272.)

Lively v. American Zinc Co.

Cases cited and approved: Washington & G. R. Co. v. McDade, 135 U. S., 554; Shadford v. Ann Arbor St. R. Co., 111 Mich., 390; Richards v. Rough, 53 Mich., 212; Kehler v. Schwenk, 144 Pa., 348; Wood v. Heiges, 83 Md., 257; Arkadelphia Lumber Co. v. Bethea, 57 Ark., 76; Sappenfield v. Main St. & Agri. Park R. Co., 91 Cal., 48; Wonder v. Baltimore & O. R. Co., 32 Md., 411; Wolfe v. New Bedford Cordage Co., 189 Mass., 591; Kent v. Y. & M. V. R. R. Co., 77 Miss., 494; Smith v. St. L., K. C. & N. Ry. Co., 69 Mo., 32; Cagney v. Hannibal & St. J. R. Co., 69 Mo., 416; Tabler v. Hannibal & St. J. R. Co., 93 Mo., 79; Dwyer v. Shaw, 22 R. I., 648; Norfolk & W. R. Co. v. Bell, 104 Va., 836; Innes v. Milwaukee, 96 Wis., 170; Stiller v. Bohn Mfg. Co., 80 Minn., 1; Towns v. Vicksburg, S. & P. R. Co., 37 La. Ann., 630.

Case cited and distinguished: Sanford Day Iron Works v. Moore, 132 Tenn., 709.

6. MASTER AND SERVANT. Injury to servant. Certified mine Foreman.

In action for death of mine servant, where there was no evidence that any of the duties required of the mine foreman were neglected, it is immaterial whether or not the mine foreman had a certificate as required by Acts 1903, chapter 237. (Post, pp. 272, 273.)

7. MASTER AND SERVANT. Injuries to servant. Evidence. Sufficiency.

In action for death of mine servant, caused by a fall from an elevator in the mine shaft, evidence held insufficient to justify a finding that the mine was not properly ventilated. (Post, p. 273.)

8. MASTER AND SERVANT. Injuries to servant. Evidence. Admissibility.

In action for death of mine servant, caused by a fall from an elevator in the mine shaft, the rejection of evidence of isolated instances of a witness in regard to the construction of mine elevators in other mines was not error. (Post, p. 274.)

9. APPEAL AND ERROR. Review. Harmless error.

As several other witnesses testified to such isolated instances, making the rejected testimony merely cumulative, plaintiff suffered no harm by its rejection. (Post, p. 274.)

10. **APPEAL AND ERROR.** Reservation of grounds of review. Where no exception was offered on the trial to the admission of evidence, and the trial judge was not asked to rule on the point, but counsel simply said, "I object," and stated no reason, the question of its admission will not be reviewed. (*Post, p.* 274.)

---

### FROM KNOX.

---

Appeal from the Circuit Court of Knox County to the Court of Civil Appeal, and by *certiorari* to the Court of Civil Appeals from the Supreme Court. —VON A. HUFFAKER, Judge.

SAWYER & UNDERWOOD, L. D. SMITH and ROSCOE WORD, for appellant.

CORNISH, FRANTZ, McCONNELL & SEMOUR, for appellee.

MR. CHIEF JUSTICE NEIL delivered the opinion of the court.

This action was brought in the circuit court of Knox County to recover damages for the alleged negligent killing of plaintiff's intestate, Howard J. Lively, in the shaft of the defendant's zinc mine. There were verdict and judgment in the trial court in favor of the defendant, and an appeal was prosecuted to the court of civil appeals. In that court the judgment of the trial court was reversed, and an order entered remanding the case for a new trial. The controversy was then transferred to this court by the writ of *certiorari*.

Numerous errors were assigned by the defendant against the action of the court of civil appeals. A writ of *certiorari* was also prosecuted by the plaintiff, likewise complaining against the action of the court of civil appeals in failing to pass upon certain errors assigned in that court.

Though the questions made are very numerous, the controversy lies within a narrow compass.

The defendant had sunk a shaft to a depth of about six hundred feet, the greater part of the way through rock. At the foot of this shaft drifts were started east and west. The eastern drift had attained only a few feet, while the western drift had extended about one hundred and fifty feet, and in this one an upraise had been started for the purpose of making a new shaft for an additional air passage. The main shaft, the only one completed, was five feet wide and about twenty-two feet long, and was divided into four compartments, one for a latterway required by our statute, two for the passage of ore buckets to transport the product to the surface, and one for the ascent and descent of the miners. This latter division of the shaft was fitted with an elevator. Our statute requires that the elevator, or carriage used for lowering or hoisting persons, shall be fitted with an improved safety catch, and a sufficient metal covering overhead; that sufficient flanges shall be attached to the sides of every drum, and every machine used for lowering and hoisting persons into and out of a mine; that adequate brakes shall be attached

to the drum; that the main coupling or socket attached to the rope supporting the cage shall be made from the best quality of iron; and other things not necessary to mention for the purposes of the present case. '

The duty to comply with such and similarly specific provisions of a statute designed as precautions against accidents and injuries is absolute, and they cannot be satisfied by a mere approximation, or by the exercise of "reasonable diligence," or "ordinary care" in an effort to comply. Sundry applications of the principle may be found in the following cases: *Deserant* v. *Cerillos Coal Co.*, 178 U. S., 410, 20 Sup. Ct., 967, 44 L. Ed., 1127; *Chicago, B. & Q. R. Co.* v. *United States*, 220 U. S., 557, 31 Sup. Ct., 612, 55 L. Ed., 582; *McDaniels* v. *Rogle Mining Co.*, 110 Mo. App., 706, 85 S. W., 679; *Little* v. *Norton Coal Co.*, 83 Kan., 232, 109 Pac., 768. All of the preceding requirements were strictly complied with, and there is no complaint on that head.

The burden of the controversy is made to rest on certain general language contained in the section in which the foregoing specific provisions subsequently appear. That language reads:

"Persons employed in such mine shall be lowered into and out of the mine by machinery; and when employees are lowered into said mine at the main outlet, the escapement shaft shall be fitted with [safe] and available machinery. . . . The hoisting machinery . . . used for lowering the employees in-

to and out of the mine shall be kept in a safe condition.'' Acts 1915, chapter 169, section 27.

The argument of the very able counsel for the plaintiff bears mainly upon the meaning of the word ''safe.'' In so far as safety could be attained by compliance with the specific requirements that follow in the succeeding parts of the section, it was, as we have already stated, satisfied by rigid compliance. But it is insisted, if we understand the position of the learned counsel, that the word ''safe,'' occurring in a statute, imports not only a compliance with the specific provisions already mentioned and the others referred to; but something in addition thereto, and means a degree of efficiency higher and stronger than that which the common law imposes on the master, in the furnishing of safe tools, machinery, a safe place, etc., to which we shall presently advert; that if something else was needed to make the cage or elevator ''reasonably'' safe, as for example the attaching of two additional doors, they should have been attached. So the controversy turns upon the meaning of the ''reasonably safe,'' the decision of which we shall postpone until we shall have stated certain additional facts, and also the charge of the court.

The elevator was securely fastened to uprights in order to insure its ready passage up and down the shaft. It was closed on two sides with steel plates. On one of the other two sides there was a rod or bar about three or three and one-half feet from the

floor of the elevator, and on the other side there was
a chain of the same height. The floor was made of
wood. The bar and chain were movable so that the
miners could enter and leave the structure at either
side. The shaft was all new, and the elevator had
been put in only the day before. On the day Howard
J. Lively's death occurred, the day shift had, at the
close of its work, about five o'clock, blasted down
some rock with dynamite in one of the drifts. Lively
belonged to the night shift. About six-thirty he and
his companions went down to the foot of the shaft
in the elevator to prosecute their work. They were
in charge of a shift boss, or foreman. Finding the
dynamite smoke too thick and oppressive, they all
ascended to the surface and waited for about an hour
and a half before again going down, in order to give
the smoke time to escape through the shaft to the
surface. When they went down this last time they
remained about an hour and a half, finding the smoke
much lighter; but it was still too dense to enable
the men to work with comfort, and therefore they
all decided to ascend to the surface. Accordingly
they got into the elevator. When they had reached
to within about two hundred feet of the surface
Lively grew faint and sank down upon the floor of
the carriage, and became unconscious. He was
standing, at the time he sank down, at one corner of
the elevator, and close to the chain. This chain had
not been fastened. He fell over to one side, and was
caught by some of the timbers with which the mine

was fitted, and so drawn from the elevator and fell down the shaft and was killed. It was, according to the custom of the business, the duty of the first miner who reached the opposite side to put up the chain, but it does not clearly appear whether Lively was the first to reach that point, nor does it appear whether he knew the custom.

The uncontradicted evidence is that the elevator was of the same kind as that used generally over the country in well-managed mines of the same character; although there is evidence that in some mines all four sides are closed with doors, or with lattice work either of wood or of woven wire. It is proven in like manner that the shaft is furnished with timbers on the inside in a manner similar to that generally used in well-managed mines of a like kind over the country, and there is no evidence to the contrary; but there is evidence to the effect that if the shaft were completely boxed in, it would be safer for the miners ascending and descending, because smoother, and less likely to catch the clothing of any occupant of the elevator in case he should lean or fall to one side or the other, the walls being about four inches distant from the elevator; but along with this evidence it is proven that it would be extremely difficult to inspect the timbers, that there would likely be much rotting, and that this lining would probably fall and do considerable injury. It is shown that the timbers are inspected every day; that with the lining or boxing referred to there could be no such inspection.

The chief discussion has arisen, as we have stated, over the meaning of the word "safe," both as to the elevator and to the shaft.

After quoting the portion of the statute which we have set out supra, the trial judge proceeded:

"And it may be further said in this connection that the defendant company was required to construct a reasonably safe shaft; elevator shaft. I instruct you that the meaning of this law as applicable to this case is that it was the duty of the defendant company to provide a reasonably and ordinarily safe elevator and shaft for carrying plaintiff's intestate as well as other employees out of said mine. The determinative question in this case is, Were said elevator and shaft safe according to the intent and meaning of said statute or law? If it was there can be no liability in this case; if it was not then the defendant company is liable in damages for the death of plaintiff's intestate, and you should accordingly so find. In considering and determining this question, I instruct you that if said elevator and shaft were in all respects, or more particularly in the respects complained of, up to the ordinary and usual standard of usage and safety, such as were in use generally by well equipped, regulated and operated mines of this character and presented no inherent and flagrant dangers such as must have been obvious to defendant company, and were such as any ordinarily cautious and prudent person would use in the operation of a mine of like character and

like condition, then I charge you that the defendant company had sufficiently and properly complied with the requirements of the law, and cannot be said to have been guilty of negligence in connection with the death of plaintiff's intestate, therefore could not be held liable in damages, and you should find accordingly and report as your verdict that you find for the defendant. If upon the other hand you find that said elevator, or shaft, was in any respect not up to the ordinary standard of usage and safety as hereinbefore defined, in that event the defendant company was guilty of negligence in not complying with the provisions of the statute requiring a reasonably safe elevator and shaft, and if the death of plaintiff's intestate resulted therefrom, that is from plaintiff's negligence, defendant company would be liable in damages and you should so find.

"To put the matter differently, if you find that said elevator and shaft at the time of said accident were such as were in common use throughout the country by well regulated and operated shaft mines of the same character, and the defendant's elevator and shaft were thus reasonably free from flagrant and obvious dangers such as would be open and obvious to defendant company, then no more was required of defendant company, and there could be no liability in this case, and your verdict would be for the defendant; but if you should find that said shaft and elevator were the same or substantially the same as ordinarily in use by well regulated and operated

mines of the same character, but notwithstanding the fact that they were the same, or substantially the same, if you further find that defendant's said shaft and elevator were so inherently and flagrantly danger- ous as that, if at all, as that the same must have been obviously so to defendant company and plain- tiff's intestate was killed as a direct and proximate result of such dangers, if any, defendant would be liable.

"Now, I may say further in this connection, as respects the character of instrumentalities the de- fendant company was required to use: When I refer to or speak of that in ordinary use by well regulated and operated mines of the same character, and that was what was required of the defendant company, that does not mean necessarily the very latest and most improved devices and appliances of elevator and elevator shaft; it means such as were in common and ordinary use generally throughout the country by mines of a similar character."

We are of the opinion that the charge was correct. It recognizes the duty of the mine owner to make the appliances safe; not merely to exercise reason- able diligence to make them safe, but to make them safe. The question turns wholly upon the meaning of the word "safe." What meaning should be as- cribed to this word? When a term having a well- recognized meaning in the common law is used in a statute that meaning will be given it in construing the statute, unless a different sense is apparent from

the context, or from the general purpose of the statute. Where, as in the case before us, the word "safe" is closely followed by special provisions looking to safety the statute will be construed to intend that the result shall be attained by the use of these means, so far as they extend. In respect of points not covered by these special means the common-law signification of the word will control. To the extent that the common law is not superseded by the special provisions it will continue in force. *Horne* v. *Memphis & Ohio Railroad Co.*, 1 Cold., (41 Tenn.), 72, 78; *State* v. *Cooper.* 120 Tenn., 549, 553, 113 S. W., 1048, 15 Ann. Cas., 1116; *State* v. *Watkins,* 123 Tenn., 502, 506, 130 S. W., 839, 30 L. R. A. (N. S.); 829. In the excerpt we have quoted from the charge, the trial judge did not deal with the special requirements of the statute as to which no question was made, but only with the common-law phase.

It is properly conceded by counsel for plaintiff that the word "safe" does not purport absolute safety, but only reasonable safety, and this finds the statute in accord with our authorities expressing the common-law rule as to the obligation of the master in respect of furnishing tools and machinery. As said in *Morriss Bros.* v. *Bowers,* 105 Tenn., 59, 58 S. W., 328:

"The employer is not an insurer or guarantor of the safety of the tools, machinery, or premises, but the measure of his responsibility is to see that they are reasonably safe for the use of the employees."

137 Tenn.—18

The words in our statute are "safe and available." The latter word means suitable or usable. In *Davis v. Northwestern R. Co.*, 75 S. C., 303, 304, 55 S. E., 526, 528, in an action by a servant for personal injuries, it was held that the words "safe and suitable" appliances meant reasonably safe and suitable, and did not require the master to furnish absolutely safe appliances. To the same effect is *Wall* v. *Marshutz & Cantrell*, 138 Cal., 522, 71 Pac., 692, 694. Whatever is according to the general and ordinary course adopted by those in the same business is "reasonably safe" within the meaning of the law. The test is the general use. *Reed* v. *Missouri, K. & T. R. Co.*, 94 Mo. App., 371, 379, 68 S. W., 364, 365; *Cunningham* v. *Journal Co.*, 95 Mo. App., 47, 51, 68 S. W. 592, 593. The term means safe according to the usages, habits, and ordinary risks of the business. Absolute safety is unattainable, and employers are not insurers. *Titus* v. *Bradford, B. & K. R. Co.*, 136 Pa., 618, 626, 20 Atl., 517, 518, 20 Am. St. Rep., 944. In *Gray* v. *Washington Power Co.*, 30 Wash., 665, 671, 71 Pac., 206, 208, it is said:

"We find from a review of the authorities that the words 'safe' and 'care' and 'safe place' are frequently used interchangeably with 'reasonably safe,' 'reasonably safe place," and 'reasonable care.' 'Safe' and 'unsafe' are words frequently used in comparison by courts in discussing the question of a reasonably safe place, and evidently without any intention of changing the well-established rule of reasonable care or a reasonably safe place."

This was, it is true, not a case between master and servant for injuries to the latter by the use of unsafe tools or appliances, or an unsafe place, but on a subject which the court held, in effect required the application of the same rule. An appliance furnished by an employer to his employee is reasonably safe where it is in general use among employers of ordinary caution and prudence in the same line of business under the same circumstances.

These authorities fully cover the point, and show that the term "safe," when used in respect of appliances to be furnished by an employer to an employee, always means, except in so far, of course, as affected by the terms of a statute, "reasonably safe;" and that "reasonably safe" means such tools as are in general use among employers of ordinary caution and prudence in the same line of business under the same circumstances.

We may add, however, that the master has the right to choose between different kinds and types of implements in such general use, and is not liable because some other style than that adopted by him may be found safer. The authorities on this point are collected in an elaborate note in 6 L. R. A. (N. S.), 493, 499. See *Washington & G. R. Co.* v. *McDade,* 135 U. S., 551, 570, 10 Sup. Ct., 1044, 34 L. Ed., 235; *Shadford* v. *Ann Arbor St. R. Co.,* 111 Mich., 390, 392, 393, 69 N. W., 661; *Richards* v. *Rough,* 53 Mich., 212, 216, 18 N. W., 785; *Kehler* v. *Schwenk,* 144 Pa., 348, 22 Atl., 910, 13 L. R. A., 374, 27 Am. St. Rep.,

633; *Wood v. Heiges,* 83 Md., 257, 34 Atl., 872; *Arkadelphia Lumber Co.* v. *Bethea,* 57 Ark., 76, 80, 20 S. W., 808; *Sappenfield* v. *Main St. & Agri. Park Co.,* 91 Cal., 48, 57, 27 Pac., 590. It was held in Wonder v. Baltimore & O. R. Co., 32 Md., 411, 419, 3 Am. Rep. 143, that the failure of a railroad company to substitute eyebolts for hooks as fasteners for the brakes of its cars did not make it liable for injuries received by a brakeman while using such brakes, though the eyebolt was a later and superior appliance for that purpose, both being approved appliances and tested by trial and experience. It was held that a master was not bound to change his machinery in order to apply every new invention or superior improvement, and that he could use appliances even when they were shown to be less safe than other kinds in use for the same ends without being liable to his employés for the consequences of such use. In accord see *Wolfe* v. *New Bedford Cordage Co.,* 189 Mass. 591, 76 N. E. 222; Kent v. Yazoo & M. Valley R. Co., 77 Miss. 494, 27 South., 620, 78 Am. St. Rep., 535; *Smith* v. *St. Louis, K. C. & N. R. Co.,* 69 Mo., 32, 33 Am. Rep., 484; *Cagney* v. *Hannibal & St. J. R. Co.,* 69 Mo., 416; *Tabler* v. *Hannibal & St. J. R. Co.,* 93 Mo., 79, 5 S. W. 810; *Dwyer* v. *Shaw,* 22 R. I., 648, 50 A. T. L., 389; *Norfolk & W. R. Co.* v. *Bell,* 104 Va., 836, 52 S. E., 700; *Innes* v. *Milwaukee,* 96 Wis.. 170, 70 N. W., 1064.

In our latest authority upon the subject in this State the effect of general usage is fully recognized. In that case it is said:

"When such proof of conformity to customary usage is made by an employer, there is made a *prima facie* case of nonliability; nothing else appearing. This case is, however, subject to be rebutted by the plaintiff employee showing by proof that the appliance where set for use or the place of work was one so inherently and flagrantly dangerous as that it must have been obviously so to the employer." *Sanford Day Iron Works* v. *Moore,* 132 Tenn., 709, 718, 179 S. W., 373, 375.

This qualification was recognized in the charge which the trial judge gave in this case, as is perceived from the excerpt which we have made. In accord with this qualification are *Stiller* v. *Bohn Manufacturing Co.,* 80 Minn., 1, 82 N. W., 981; *Towns* v. *Vicksburg S. & P. R. Co.,* 37 La. Ann., 630, 55 Am. Rep., 508.

It is insisted in behalf of the plaintiff that the requirement of chapter 237, Acts 1903, to the effect that those operating mines in the State shall employ a foreman bearing a certificate from the designated authorities of the State showing a fitness for the performance of his duties, was disregarded. The breach of duty is said to consist in the fact that there is no competent evidence that the foreman did have a certificate, and if there be such competent evidence, still it is shown that he was wholly under the control of the defendant's superintendent, and therefore the case is the same as if he had no certificate at all. The question is immaterial, because there is no evi-

dence whatever that any of the duties required of
the mine foreman were neglected.

The court of civil appeals reversed the judgment of
the trial judge on the ground that the mine was not
properly ventilated.  There is no evidence in the rec-
ord to sustain this holding.  As already stated, the
shaft had just been completed, and the drifts from
the bottom of the shaft had been driven only a short
distance.  It was impossible to construct an air shaft
until the main shaft had been sunk, but there was no
gas in the mine, and the smoke generated by the ex-
plosion of dynamite in the blasting of rock had its
exit upward through the four orifices of the shaft
which, as we have said, was five feet by twenty-two
feet.  In addition, a fan was in operation in the mine,
and compressed air was conveyed through pipes
down into the mine.  There is no suggestion in the
record that any other devices should have been used.
It was only a question of time for the escape of the
smoke, and the miners were not required to stay in
the mine when the smoke was too dense.  They had a
right to the use of the elevator to ascend, and did
so use it.

Another ground on which the court of civil appeals
reversed the judgment was that the deceased was in-
experienced, and was not properly warned of the
danger.  The evidence shows he had had considerable
experience in other mines, and there is no evidence to
the effect that he was not warned of such dangers as
existed.

It is insisted in behalf of the plaintiff that the trial judge committed error in refusing to permit the witness C. M. Jones to testify concerning his discoveries in two or three mines that he had seen in Kansas, Colorado, and Mexico, concerning the construction of elevators, as to their being boxed on four sides. There was no error in this, because the witness did not undertake to testify as to the general conduct of business of this kind. In addition, it is clear that the plaintiff could have suffered no harm, because several other witnesses testified as to such isolated instances; as many as four of them. The evidence of Jones would therefore have been merely cumulative, and could not have affected the result.

Error is assigned on the alleged action of the trial judge in admitting the evidence of one Pearl Epperson, to the effect that the elevator in question was as good as any, provided the chain was up. It is said that this invaded the province of the jury; but there was no exception offered, on the trial, to this evidence. The counsel simply said, "I object," and stated no reason, and the trial judge was not asked to rule upon the point, and did not rule on it.

There are a few other assignments, but they are immaterial.

There is error in the judgment of the court of civil appeals, and it is reversed. There is no error in the judgment of the trial court, and it is affirmed.

The plaintiff will pay the costs of the cause.