Geraldine C. **MEDINA**, Plaintiff, Appellant,

v.

Warren B. **RUDMAN** et al., Defendants, Appellees.

No. 76–1057.

United States Court of Appeals, First Circuit.

Nov. 9, 1976.

---

Leonard W. Yelsky, Cleveland, Ohio, with whom David A. Snow and Yelsky, Eisen & Singer Co., L.P.A., Cleveland, Ohio, were on brief, for appellant.

David H. Souter, Atty. Gen., Concord, N.H., with whom Thomas D. Rath, Deputy Atty. Gen., James C. Sargent, Jr., Atty., Concord, N.H., were on brief, for appellees.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Geraldine C. Medina appeals from a judgment of the District Court for the District of New Hampshire dismissing her complaint for damages and an injunction against the members of New Hampshire's State Greyhound Racing Commission (the "Commission")[1] and its Attorney General.

1. The State Greyhound Racing Commission is a three-member body established under New Hampshire law NH RSA 284:6–a (Supp.1975). No one may conduct, hold or operate any dog

Citing 42 U.S.C. §§ 1982, 1983, 1984, and 1985, Mrs. Medina requested the district court to order the Commission to approve her "participation" (by purchasing stock in the licensee) in an outstanding greyhound racing license that the Commission had issued to a corporation known as the New Hampshire Kennel Club, Inc. (the "Club"). Her complaint followed upon the Commission's refusal, on advice of the Attorney General of New Hampshire, to approve her "as a financial backer, owner or participant in any way" under the Club's license.[2]

While Mrs. Medina's complaint cited several civil rights statutes, and included an unsuccessful request for a three-judge court to consider the alleged unconstitutionality of parts of New Hampshire's greyhound racing laws, this appeal is limited to the district court's determination that her complaint did not state a claim under 42 U.S.C. § 1983. Mrs. Medina contends chiefly that the Commission's disapproval of her participation without, as she asserts, "adequate notice and hearing on the merits of a controversy between herself and the unknown contents of the [Attorney General's] report", deprived her of due process of law under the fourteenth amendment, giving rise to a right of action under § 1983. The court below ruled that her interest in acquiring stock in a parimutuel greyhound racetrack was not protected liberty or property within the fourteenth amendment.

Before proceeding, we observe that the court below should either have treated defendants' motion to dismiss under Fed.R. Civ.P. 12(b)(6) as one for summary judgment, or else not given specific consideration, as it did in its opinion, to a number of

facts outside the pleading, found principally in affidavits filed by the parties. *See* Fed. R.Civ.P. 12(b). *O'Brien v. DiGrazia,* 544 F.2d 543 (1st Cir. 1976). Rule 12(b) provides that if "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment." (The court had before it a separate motion for summary judgment that was argued simultaneously with the 12(b)(6) motion but chose to act under the latter.) The court's error was, however, harmless. The dismissal can be justified without reference to the extrinsic material which, while relevant, is not determinative. *Cf. O'Brien v. Moriarty,* 489 F.2d 941 (1st Cir. 1974).

The events surrounding plaintiff's claim are clear enough. An Ohio resident, plaintiff is the principal shareholder of four Weight Watcher franchises there, and appears to possess substantial means. In the first half of 1975 she loaned $150,000 to the Club, which owned the New Hampshire real estate upon which a greyhound racing track was then in process of being built. A license to conduct greyhound races during the 1975 season had already been issued to the Club. After plaintiff's initial loan, the Club's two principal stockholders, Henry D. Bogatin, Jr. and Angelo Cassaro, assured plaintiff that, in view of her substantial financial position, they would sell her an approximately fifty per cent interest in the Club, but their undertaking to do so was explicitly made contingent upon her obtaining approval from the Commission. Pursuant to this informal understanding "in principle", but before she had obtained the Commission's approval, Mrs. Medina loaned

---

race or public meet at which parimutuel pools are sold without a license from the Commission. NH RSA 284:12–a (Supp.1975). If the Commission is satisfied that all provisions of law and its rules and regulations have been and will be complied with, it *may* issue a license, NH RSA 284:16–a (Supp.1975). [Emphasis supplied.]

**2.** Applicants for dog racing licenses, holders of such licenses, and individuals owning interests in closely-held licensee corporations, must file with the state Attorney General sworn state-

ments disclosing their names, occupations and addresses, the nature of their ownership interest in the licensee, information as to any felony convictions, and a detailed statement of assets and liabilities. NH RSA 284:15–b (Supp.1975). New Hampshire law makes no explicit provision for a *prospective* purchaser of stock in an existing licensee like Mrs. Medina to file such a statement with the Attorney General as was done here, nor does the law expressly prohibit one who has not received Commission approval from purchasing stock.

more money to the Club, making her investment in the neighborhood of $700,000.

In August, 1975, Mrs. Medina, with the assistance of an attorney, made out and submitted to the Attorney General a form entitled "Individual Disclosure of Information", this being what Mrs. Medina calls in her complaint "an application to participate in the previously issued [Club's] Greyhound Racing license". The form on its face provided that it was "To be submitted to Attorney General under RSA 284:15–b" and "Must be filed by each individual  .  .  . holding legal or beneficial ownership interest if the ownership interest of the above applicant or license holder is held by 25 or less persons  .  .  ." [3]

On this form, Mrs. Medina indicated the Club as the "present license holder", and that she was presently a mortgagee of the Club which was indebted to her for $700,-000. After detailing her financial condition, she went on to indicate that if approved by the Commission she hoped to participate through a limited partnership arrangement, and through stock ownership in the Club, which would be the General Partner, in the operation of a greyhound racing facility. Stock ownership in the Club "presently anticipated" was said to be as follows:

### VOTING COMMON

| | |
|---|---|
| Henry D. Bogatin, Jr. | 200 shares |
| Angelo Cassaro | 200 shares |
| Geraldine Medina | 300 shares |

### NON VOTING COMMON

| | |
|---|---|
| Geraldine C. Medina | 300 shares |

Plaintiff expressly noted that "voting control would remain in the hands of the present stockholders of the present licensee", viz. Bogatin and Cassaro.

Following submission of the so-called application, the state Attorney General conducted an investigation and, on September 26, 1975, the Commission wrote to the Club that "[b]ased upon a report from the office of the Attorney General, the Commission declines to approve Geraldine C. Medina as a financial backer, owner or participant in any way under the license granted to the New Hampshire Kennel Club." There is no allegation or evidence that Mrs. Medina at this juncture ever requested a Commission hearing.[4] But twelve days later, on October 7, 1975, she filed this action in the district court, seeking initially a temporary restraining order and preliminary injunction, which the court denied, ordering defendants to allow her to participate under the Club's license.[5]

---

**3.** The district court spoke of Mrs. Medina as an applicant for a racetrack license. Clearly, as the court acknowledged, this was not technically correct as there is no suggestion that she ever intended personally to secure a license. Moreover, since the existing stockholders, Bogatin and Cassaro, were to retain over 50% of the *voting* stock, the license issued to the Club would seem not to "automatically cease" under the provisions of NH RSA 284:16–a, upon Mrs. Medina's acquisition of stock, as the district court assumed.

On the other hand, calling Mrs. Medina a license applicant is, as a practical matter, not too far off the mark. The Club's license was subject to annual renewal and could be revoked at any time by the Commission (though only "for good cause upon reasonable notice and hearing", NH RSA 284:16–a); and it appears that if Mrs. Medina persisted in acquiring stock without Commission approval, its license would be in jeopardy under existing Commission policy and practice. For purposes of this case, we are willing to accord Mrs. Medina the

most favored status supported by the pleadings, that of a license applicant, particularly where the pleadings do not indicate how applications like hers fit in the regulations of regular licensing procedures.

**4.** As we agree with the district court that the fourteenth amendment afforded Mrs. Medina no right to a hearing, we need not consider the effect of her failure to allege such a request.

**5.** Neither in the prayers of her complaint nor in her request for preliminary relief, did Mrs. Medina make specific request for the "process" i. e. notice of charges and opportunity for hearing, the omission of which allegedly constituted a denial of due process of law. In argument to the district court, her attorney finally came round to stating that, as alternate relief, she wished a hearing and disclosure of the basis on which the Attorney General disapproved her and the court said it considered this a motion to amend and allowed it.

In her district court complaint, plaintiff alleged that "subsequent to plaintiff's application to be licensed to participate in said Club license" the Attorney General conducted "some type of investigation" in which she cooperated; and that although the results of the investigation were kept secret from her, she believed this to be the basis for turning her down. She alleged that "she has a reputation unblemished in any way" and complies with "any of the standards as set forth in New Hampshire Revised Statutes Annotated, Chapter 284 and all related sections thereto." Plaintiff further alleged, in conclusory fashion, that defendants acted willfully, knowingly and improperly with the specific intent to deprive her of her constitutional rights, and that they conspired and acted arbitrarily, in abuse of their discretion.

In deciding whether Mrs. Medina had a claim cognizable under § 1983, the court below assumed that the only federal right that might arguably have been denied her by New Hampshire officials, under color of state law, was a right to due process.[6] The court focused on that question, rightly we think. There was clearly no issue of contract impairment under Art. I, § 10 of the Constitution, New Hampshire's greyhound racing laws being fully extant before she loaned money to the Club, *South Terminal Corp. v. EPA,* 504 F.2d 646, 680 (1st Cir. 1974); nor is there any equal protection issue, there being insufficient facts alleged to indicate a "purposeful discrimination" by state officials. *Snowden v. Hughes,* 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944); *see Cordeco Development Corp. v. Vasquez,* 539 F.2d 256, 260, n.5 (1st Cir. 1976); *Burt v. City of New York,* 156 F.2d 791 (2d Cir. 1946) (Hand, J.).

The district court's due process analysis closely relied upon that in *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), in which the Supreme Court said,

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. . . . [T]he range of interests protected by procedural due process is not infinite." *Id.* at 569–70, 92 S.Ct. at 2705.

The court went on to quote from *Roth* that to have a protected property interest in a benefit, a person must have more than an "abstract need or desire". Property interests

"are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that supports claims of entitlement to those benefits." *Id.* at 577, 92 S.Ct. at 2709.

The court found that Mrs. Medina lacked any such property interest here "cognizable under state law, rules, custom, or understanding. State law does not create any property interest in racetrack license applicants; the law is expressly permissive. . . . Neither can plaintiff claim any 'understanding'. In her contractual dealings with the Kennel Club, she expressly acknowledged the statutory necessity of obtaining a license in order to participate in the operation of the racetrack."

The district court rejected any notion that Mrs. Medina's application involved a "fundamental" or "natural" right—such as the right to earn a living and engage in one's chosen occupation—which might, apart from state law, be a protected "liberty" interest. *See Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957); *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Finally it distinguished various license cases, including *Raper v. Lucey,* 488 F.2d 748 (1st Cir. 1973) (driver's license), on the ground that they involved broadly-shared privileges essential in the pursuit of

---

6. "[N]or shall any State deprive any person of life, liberty, or property, without due process of law; . . . ." U.S.Const. amend. XIV, § 1.

a livelihood. The court accordingly ruled that the guarantees of the due process clause were simply inapplicable and that, as a consequence, plaintiff had no claim under § 1983.

█ We agree with the district court. While the great variety and range of protected liberty and property interests make them difficult to classify, we accept the lower court's thesis that a person's interest in participating in the ownership of a pari-mutuel greyhound racetrack is neither a right recognized under New Hampshire law nor is it a "fundamental" or "natural" right.

█ In the recent term, after the district court's decision in the present case, the Supreme Court has come down with several decisions reiterating and narrowing the *Roth* formulation. *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *see Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). *See also Kelley v. Johnson,* 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976). While the Supreme Court in these cases recognized in passing the existence of a class of "fundamental" liberties (said to trigger "substantive" rather than merely "procedural" protection, *see Kelley v. Johnson, supra,* at 244, 96 S.Ct. 1440, *Paul v. Davis, supra,* at 710 n.5, 712–13, 96 S.Ct. 1155), the Court defined this class rather narrowly,[7] reserving particular emphasis for those "liberty" or "property" interests which attain status as such under the due process clause "by virtue of the fact that they have been initially recognized and protected by state law". *Paul v. Davis, supra,* at 710, 96 S.Ct. at 1165. The Court said it is the alteration or extinguishing of a right or status previously recognized by state law that invokes the procedural guarantees contained in the due process clause. *Id.* at 711, 96 S.Ct. 1155.

█ Under this approach, it is difficult to see how New Hampshire law can be said to recognize or create a vested right or status in favor of potential greyhound license applicants which defendants here are taking away. Doubtless once a license, or the equivalent, is granted, a right or status recognized under state law would come into being, and the revocation of the license would require notice and hearing as, indeed, New Hampshire law now provides. *See Paul v. Davis, supra,* at 710–11, 96 S.Ct. 1155; *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971). But nothing has so far been promised or granted by the state to Mrs. Medina.

█ A state-recognized interest might also exist if the New Hampshire racing law could be said to confer upon Mrs. Medina a right, upon equal terms with others generally, to be licensed so as to engage in a common activity or pursuit. In distinguishing *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), the *Paul* Court said that "the right to purchase or obtain liquor in common with the rest of the citizenry" was a right held under state law. *Paul v. Davis, supra,* at 708, 96 S.Ct. at 1164, and it seems likely that when a state holds out a right to citizens to engage in an activity on equal terms with others, a state-recognized status exists. The case of *Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957), finding a right of due process with respect to bar admissions, can be explained on such a ground (as well as on the ground that the right to pursue an ordinary occupation is, by itself, a "fundamental" liberty interest, *infra*). This circuit has held that obtaining a driver's license is subject to due process protection, *Raper v. Lucey,* 488 F.2d 748 (1st Cir. 1973), and the same has been held in another circuit with respect to a radio operator's license. *Homer v. Richmond,* 110

---

**7.** *See* dissenting opinions in *Paul v. Davis,* 424 U.S. 693, 714, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (Brennan, J.); *Meachum v. Fano,* 427 U.S. at 229, 96 S.Ct. at 2080 (Stevens, J.). The "fundamental" liberties acknowledged by the Court were chiefly those having to do with

marriage, procreation, contraception, family relationships and child rearing and education. *Paul v. Davis, supra,* at 712–13, 96 S.Ct. 1155. The Court has, of course, also acknowledged the rights created by other provisions of the Constitution. *Id.* at 710 n.5, 96 S.Ct. 1155.

U.S.App.D.C. 226, 292 F.2d 719 (1961). In these cases, the government recognized an entitlement in favor of all persons, or of a class, upon terms and conditions of general application.

But racing licenses have not been viewed by the New Hampshire courts as open to all persons who meet prescribed standards. Rather they are treated as discretionary with the racing Commission. The statute says only that the Commission *"may"* issue a license if satisfied that all provisions of law and its rules and regulations have been and will be complied with. NH RSA 284:16–a (Supp.1975). Referring to a horse racing license, the New Hampshire Supreme Court has rejected a claim that once an applicant complies with the statutes and meets all requirements, the commission had no discretion to withhold a license. *North Hampton Racing & Breeding Assoc. v. New Hampshire Racing Commission,* 94 N.H. 156, 48 A.2d 472 (1946). The court explained that the state horse racing statute, on which the greyhound racing laws are patterned

> "deals with a private enterprise which, of its nature, is not only privileged, but which presents a social problem properly coming under the exercise and jurisdiction of the police power of the state and which requires strict regulation and supervision." *Id.* at 159, 48 A.2d at 475.

In *Ratti v. Hinsdale Raceway,* 109 N.H. 270, 272, 249 A.2d 859, 861 (1969), the court said that racetracks were permitted by the state to raise revenue, and that regulation allowed tracks to be run by private parties while guarding against "whatever social evils may be involved."

We think that New Hampshire, in its greyhound licensing laws, rather than creating a general entitlement in favor of all persons who qualify, has indicated merely that the Commission may issue licenses "at will". *Cf. Bishop v. Wood, supra;* *Board of Regents v. Roth, supra.* We conclude, therefore, that Mrs. Medina's desire to participate in the ownership of a greyhound parimutuel track did not enjoy, either explicitly or implicitly, a protected status under New Hampshire law, and was not on that theory, a "liberty" or "property" interest.

Not being state-created, any asserted "right" to participate in the racetrack comes under the due process clause only if it is a right so "fundamental" as to elicit protection even though not otherwise defined in state law. Rights of this potency are a special breed, *see* note 7, *supra,* and we find little authority for so classifying Mrs. Medina's wishes. Over fifty years ago, in *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923) the Supreme Court described the right "to engage in any of the common occupations of life" as one of the fundamental privileges "long recognized at common law as essential to the orderly pursuit of happiness by free men." *See Schware v. Board of Bar Examiners, supra. Meyer* has recently appeared mostly in dissenting opinions; but even assuming its continued vitality, we do not consider racetrack ownership to be one of life's "common occupations". Gambling is traditionally suspect in our society, and investment in such an enterprise, when permitted at all, is plainly open to the strictest kind of supervision.

We think the state, under its police powers, is entitled, if it elects, to issue racetrack licenses, and to regulate participation thereunder, on a discretionary basis as it has chosen to do here.[8] Given the social evils associated with gambling and the state's revenue interests, the state's choice of means in the selection of licensees is entitled to prevail over the private interests of potential investors. We do not decide if and to what extent a similar analysis

---

**8.** While vesting discretionary powers in a state commission may open the way to abuse, a state may reasonably believe that discretionary control makes it easier to see that licenses do not fall into the wrong hands and that only persons who will act affirmatively in the public interest obtain licenses. *Cf. Kelley v. Johnson, supra,* 425 U.S. at 247, 96 S.Ct. 2532. New Hampshire law does provide a remedy by which an aggrieved party may appeal to the state courts to challenge Commission decisions deemed arbitrary NH RSA 284:13 (Supp.1975).

would stand up if applied to another type of enterprise. *Cf. South Gwinnett Venture v. Pruitt,* 491 F.2d 5 (5th Cir.) *cert. denied* 419 U.S. 837, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974); *Atlanta Bowling Center, Inc. v. Allen,* 389 F.2d 713 (5th Cir. 1968); *Hornsby v. Allen,* 326 F.2d 605 (5th Cir. 1963).

*Affirmed.*