**Richard O'NEILL and Lawrence Caldwell, Plaintiffs,**

v.

**TOWN OF NANTUCKET and Kenneth Holdgate, Jr., Donald Oliver, Bernard Grossman, and Charles J. Gardner, Individually and as Selectmen of the Town of Nantucket, Defendants.**

**Civ. A. No. 82–0775–MA.**

United States District Court, D. Massachusetts.

Aug. 13, 1982.

M. Robert Dushman, Brown, Rudnick, Freed & Gesmer, Boston, Mass., for plaintiffs.

Richard L. Zisson, Sp. Town Counsel, Town of Nantucket, Zisson & Veara, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

This case is before the Court on the parties' cross motions for summary judgment. Fed.R.Civ.P. 56. The controversy revolves around the licensing of certain amusement machines in the Town of Nantucket. The factual record is virtually undisputed.

### I.

The plaintiffs are Richard O'Neill and Lawrence Caldwell. They entered into a venture wherein O'Neill would operate and maintain twenty-five coin-operated electronic amusement machines, also known as "videogames," on the property owned by Caldwell at 26 Centre Street in Nantucket, Massachusetts. The defendants are Nantucket selectmen, both individually and in their official capacities, and the Town of Nantucket itself.

O'Neill requested a license for twenty-five electronic game machines at the Centre Street site. He also requested licenses for

two other locations. On December 31, 1981, documents indicating that the licenses were granted were issued containing the signature of Kenneth W. Holdgate, Jr., as Chairman of the Board of Selectmen. The document relating to the Centre Street location reads as follows:

> This is to Certify that Richard O'Neill d/b/a Gray Lady Luck,—Centre St.; Nan. IS HEREBY GRANTED A LICENSE For Twenty-Five Electronic Game Machines. This license is granted in conformity with the Statutes and ordinances relating thereto, and expires January 1, 1983 unless sooner suspended or revoked.

(handwritten portions underlined).

The Board of Selectmen met on January 6, 1982. After some discussion and a report by the Board's Executive Secretary the Board sent a letter, signed by Holdgate, indicating that the "licenses issued were not in accordance with the controlling statute (M.G.L. Chapter 140, Section 177A), and are, therefore, of no effect." The letter stated that separate licenses, indicating the type of machine and the premises, are required for each machine. Also at the January 6th meeting, the Board adopted new procedures for issuing licenses. The procedures included application to the Board, notice published in the local paper and a public hearing. Finally, although the record of the meeting is ambiguous, the affidavits indicate that the Board voted to permit individuals operating with licenses obtained under the old procedure to continue to do so until hearings mandated by the new procedures were held.

Upon being informed that the Board considered their licenses to be "of no effect" plaintiffs, without concurring with the Board's view, renewed their request for the licenses. A public hearing was scheduled for January 13, 1982 and advertised locally. At the hearing plaintiffs were represented by counsel and submitted a written application.

The meeting began almost immediately with a dispute over its purpose, with plaintiffs' counsel contending it was a revocation hearing while members of the Board indicated it was a hearing on the submitted application. In any event, a variety of evidence was offered including eight letters and two phone calls received prior to the meeting that were read aloud. The evidence also included a report by the health inspector and statements by unidentified individuals, several residents, a minister and the Chief of Police. Plaintiffs and their attorney also made statements. The minutes of the meeting indicate overwhelming opposition to automatic amusement games in the "Old Historic District" by those who made their views known. After taking this evidence the Board adjourned the meeting for one week.

The Board reconvened on January 20, 1982 and further materials were accepted including additional letters, a petition, a report on a survey of several police departments concerning their experience in this area, and statements by O'Neill, who was present without an attorney. In addition, an extended discussion with the Town Counsel ensued concerning the necessary prerequisites for denying an application. Another attorney also spoke on this issue. The Board then voted to deny the application and outlined the basis for that decision in a letter to O'Neill dated February 5, 1982.[1] The Board also voted to hold "a hearing on the proposed revocation of the license which was issued to Mr. O'Neill on

---

1. The letter reads, in relevant part:

   . . . your application would result in additional noise, pedestrian traffic, litter, injury to neighboring businesses and threats to the public safety at this particular location.

   \*   \*   \*   \*   \*   \*

   The Board further found that public expression of disapproval was very broad, coming from a wide-spread cross-section of the community . . .

   The Board also found that because of the known, wide-spread attractiveness of these games to young people of the community and particularly those under the age of fourteen, the central location of a game parlor or arcade would provide easy access to such children during school hours and that as such the presence of the arcade would have an adverse impact on the general welfare of the community.

December 31, 1981...." That hearing was scheduled for February 10, 1982.

In a letter dated January 28, 1982, O'Neill was notified of the proposed revocation hearing and the bases for revocation. Plaintiffs did not attend this February 10th meeting and no new evidence was offered. The Board accepted the prior testimony taken in the January 13th and 20th hearings and voted to revoke the license. A letter indicating their decision was sent to O'Neill. The bases for the revocation were identical to the reasons given in the earlier letter for denying the application.

## II.

The procedural protections of the due process clause are only applicable when there is an infringement of a protectable interest. In this case, the asserted interest is a property right. There are two ways the due process clause could be implicated in this case. First, if the Massachusetts licensing statute confers on the plaintiffs, either as members of the general public or some more specific class, a right "to be licensed so as to engage in a common activity or pursuit." *Medina v. Rudman*, 545 F.2d 244, 250 (1st Cir. 1976), *cert. denied*, 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 177 (1977). Typical of this sort of right is the right to a driver's license. *Raper v. Lucey*, 488 F.2d 748 (1st Cir. 1973). Second, "it is the alteration or extinguishing of a right or status previously recognized by state law that invokes the procedural guarantees contained in the due process clause." *Medina v. Rudman*, 545 F.2d at 250. The most relevant example of this form of protectable interest would be when a license is granted and later revoked. *Id.*

■ Turning first to the claim that plaintiffs had a protectable interest *as applicants*, a property interest can only exist if plaintiffs can demonstrate "a legitimate claim of entitlement." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). The notion of an "entitlement" is merely a description of the conditions that would permit an individual to reasonably rely on governmental action.

> It is the purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity to vindicate those claims.

*Board of Regents v. Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. The focus must be on whether the plaintiffs could reasonably rely on receiving a license based on this statutory scheme.

■ The more narrowly drawn the statute or "the more circumscribed is the government's discretion (under substantive state or federal law) to withhold benefit, the more likely that benefit constitutes 'property,' for the more reasonable is reliance upon its continued availability and the more likely it is that a hearing would illuminate the appropriateness of withholding it in an individual case." *Beitzell v. Jeffrey*, 643 F.2d 870, 874 (1st Cir. 1981). *See also Perkins v. Board of Directors of School Administrative District No. 13*, 686 F.2d 49, —— (1st Cir. 1982).

■ Applying these principles to M.G.L. c. 140 § 177A demonstrates that the applicants have no general right to be licensed to operate electronic game machines and could not reasonably rely on those licenses being granted. The Massachusetts Supreme Judicial Court did not consider § 177A as an automatic way for any qualified applicant to obtain a license. Instead, the statute grants local authorities considerable discretion. The statute, on its face, indicates that the local authorities *may* grant a license to individuals meeting the statutory requirements. The First Circuit Court of Appeals found this language to be dispositive in *Medina v. Rudman*, where that Court found no protectable property interest in a potential race track license. The Supreme Judicial Court specifically rejected the contention that § 177A created an entitlement, again relying on the permissive language of the statute:

The wording of § 177A of G.L. c. 140 does not require the conclusion that local authorities must issue licenses for the operation of automatic amusement devices regardless of their effect upon the welfare of the community. The language of the statute is that (... licensing authorities ... may grant ...) licenses. The word 'may' in a statute commonly imports discretion. There is nothing in the general context of the statute or the purpose for which it was enacted that requires a different construction. Section 177A of c. 140 of the General Laws is discretionary rather than mandatory in so far as it relates to the issuance of licenses by local authorities.

*Turnpike Amusement Park, Inc. v. Licensing Comm. of Cambridge*, 343 Mass. 435, 179 N.E.2d 322 (1962) (citations omitted).

The local licensing boards may consider local needs and circumstances when granting licenses. There is no expectation that every license application will be granted, particularly in light of settled Massachusetts law to the contrary. The affidavits also indicate that, at least in Nantucket, not every application is granted. The plaintiffs simply have no legitimate claim of entitlement to an electronic game license as applicants. To the extent the facts can be construed as a denial of an application, they could state no due process claim.[2]

Without a claim of entitlement as applicants, plaintiffs' due process rights may only arise if there was a previously recognized right or status that was removed. "Doubtless once a license, or the equivalent, is granted, a right or status recognized under state law would come into being and the revocation of the license would require notice and hearing...." *Medina v. Rudman*, 545 F.2d at 250. The facts of this case must be examined to determine if, as plaintiffs claim, a valid license was granted and then revoked without due process.

Plaintiffs contend that the license at issue here was granted in the ordinary and customary manner and was valid. Defendants assert that it failed to comply with the governing statute and, thus, is void. *See e.g. United States v. Two Hollycrane Slot Machines*, 136 F.Supp. 550, 551 (D.Mass. 1955) ("Therefore, a 'digger' could not legally be licensed under this statute [§ 177A], and the acts of certain Massachusetts municipal officials in granting such licenses, as I find they have, are void and of no effect."). Obviously, if the initial license is void, plaintiffs are not entitled to any process before it is considered a nullity because they never possessed a protectable interest.

One infirmity asserted by the defendants in their letter to plaintiffs and in their various pleadings before this Court is that under c. 140 § 177A, each machine must be individually licensed and these twenty-five machines were not. Defendants argue that these twenty-five machines were improperly licensed in a single document. The difficulty with this position is that the statute does not say, nor have the parties called to my attention any case indicating that, each machine must be licensed separately. Since the statute is explicit in many other regards, I am unwilling to imply a rule requiring a separate license for each machine. The license was not void for licensing more than one machine on a single sheet of paper.

The letter declaring the licenses to be "of no effect" also refers to the statutory requirement that each license indicate the "type" of machine licensed. The statute permits substitution of machines of the

2. Plaintiffs rely substantially on *Hornsby v. Allen*, 326 F.2d 605 (5th Cir. 1964) to bolster their claim that they acquired property rights as applicants. Regardless of the general validity of *Hornsby* in other respects, it is clearly not the law in this Circuit in one critical way. The First Circuit Court of Appeals, in *Medina v. Rudman, supra*, has clearly drawn a distinction between the interests found in applicants for licenses and the interests of those who already hold licenses. *Hornsby*, on the other hand, is premised on the basis that this distinction does not exist. That Court stated, "[w]e see no valid distinction between the revocation of a license, as in *Glicker* [*v. Michigan Liquor Control Commission*, 160 F.2d 96 (6th Cir. 1947)] and the denial of an application, as in the case at hand." *Id.* at 610. The analysis of *Medina*, not *Hornsby*, is the governing law in this case.

same type without a new license. The type of machines licensed here are "Electronic Game Machines." The goal of the licensing statute is to permit communities to control the use of certain devices within their jurisdiction. *Turnpike Amusement Park, Inc. v. Licensing Comm. of Cambridge*, 343 Mass. 435, 179 N.E.2d 322 (1962). Some specificity is necessary in stating the types of machines since not all electronic games are equally acceptable to every community. *See e.g. Rothner v. City of Des Plaines*, No. 81–C2669, *slip op.* (N.D.Ill. Sept. 14, 1981) (ordinance barring videogames upheld). The vagueness of this license issued by the Board precludes any meaningful regulation, contrary to the intent of the Legislature in enacting these provisions. On this basis, I find the license to be fatally defective and, therefore, void. Consequently, plaintiffs were denied no due process rights.

■ Even if the license was adequate and revoked, plaintiffs were accorded sufficient procedural protection to satisfy their right not to be deprived of a property interest without due process. The goal of the procedural protections is to "assure that substantial justice would be done." *Konstantopoulos v. Town of Whately*, —— Mass. ——, 424 N.E.2d 210, 218 n.9 (Mass.1981). Arbitrary or capricious decisions are curbed when notice and hearings are provided.

The facts of this case indicate that both the notice and the hearing were adequately afforded these plaintiffs. Plaintiffs were notified by letter January 6, 1982 of the defect in the license. They were not deprived of the license, although already void, until after they were given a hearing. Hearings were held January 13, 1982, January 20, 1982 and February 10, 1982. Notice was sent approximately a week before each hearing. There was no defect in the notice; it was entirely adequate. Plaintiffs were given ample opportunity to prepare.

The hearings themselves were also adequate. While there is a continuing dispute as to which meetings were "application" hearings and which were "revocation" hearings, the ultimate result was that plaintiffs were given an adequate opportunity to present their case.

There is no predetermined statutory requirement for these particular hearings. In fact, the statute itself does not provide the opportunity for hearings. *Compare* M.G.L. c. 140 § 183A. The nature of the hearings has to be defined by more general due process principles. "The formality and procedural requisites for [a due process] hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." *Boddie v. Connecticut*, 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971). Thus, there are no fixed requisites for due process hearings in every circumstance.

The hearings here consisted of the right to be present, with counsel, and the right to make statements on your own behalf. Additionally, witnesses supporting plaintiffs' position were permitted to speak or write to the Board. Plaintiffs' primary objection to the hearings is that they did not provide the right of cross examination. This claim is made without any allegation that plaintiffs ever requested this opportunity.

■ In any event, cross examination is not a fixed requirement of due process. "It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). In this case, the nature of the inquiry, which focused on the impact of plaintiffs' establishment on the town rather than on any moral, ethical or legal problems with the plaintiffs themselves, indicates that a somewhat less adversarial proceeding is appropriate. Were this a revocation based on misconduct by the plaintiffs the situation could well demand the full panoply of procedural rights, including cross examination. However, where the focus is on the impact this venture will have on the community, the right to speak and the other protections given at these informal hearings satisfy the requirements of due process. *See e.g. Lotto v. Commonwealth*, 369 Mass. 775, 780, 343 N.E.2d 855

(1976). Plaintiffs' interest in installing amusement games at this one particular location is simply not strong enough to outweigh the competing interests of the town in expeditious and accurate resolution of these problems by following something less than the full judicial model for hearings.

It seems that ultimately the core of this case is plaintiffs' disagreement with the Boards' decision. It is not the function of a federal district court to sit as "selectman of last resort." Rather, the only inquiry properly conducted here concerns the procedures followed and whether there was *any* evidence to support the Boards' decision.[3] As the Court said in *Hornsby v. Allen, supra,*

> The proper question to be determined upon the hearing of this case in the district court is not whether the plaintiff below is entitled under the law to a ... license. The determination of whether she should be granted one is a function of the Aldermanic Board. The role of the Courts is to ascertain whether the manner in which this determination was or is made accords with constitutional standards of due process and equal protection.

*Id.* at 612.

I conclude that, based on the uncontroverted facts in the record, plaintiffs were not deprived of either due process or equal protection of the laws.[4] Consequently, plaintiffs' cross motion for summary judgment is denied. There being no factual issues to resolve, defendants' motion for summary judgment is granted.

SO ORDERED.

---

**3.** *See* note 2, *supra,* for the basis of the Boards' decision. While it is not this Court's role to reflect on the wisdom of the decision reached here, I find that some evidence existed to supply a basis for the decision.

**4.** The claimed equal protection violation is completely baseless. There is no allegation of

"purposeful discrimination." *Snowden v. Hughes,* 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944). Nor do the affidavits indicate any unequal treatment against plaintiffs. In fact, at least one plaintiff has been granted licenses at other location.