MID–SOUTH INDOOR HORSE RACING, INC., Plaintiff/Appellant,

v.

TENNESSEE STATE RACING COMMISSION, Defendant/Appellee.

Court of Appeals of Tennessee, Middle Section, at Nashville.

Aug. 17, 1990.

---

William M. Leech, Jr., Howard T. Wall, III, Waller, Lansden, Dortch & Davis, Nashville, for plaintiff/appellant.

John Knox Walkup, Sol. Gen., Gina J. Barham, Albert L. Partee, Asst. Attys. Gen., Charles W. Burson, Atty. Gen. and Reporter, Nashville, for defendant/appellee.

## OPINION

KOCH, Judge.

This appeal calls into question the procedure used by the Tennessee State Racing Commission to consider an application to hold hackney pony races in Memphis. The applicant filed a petition for review in the Chancery Court for Davidson County after the commission denied its application, asserting that the commission's procedures deprived it of notice and an opportunity to be heard concerning the matters upon which the commission based its decision. The trial court dismissed the petition for failure to state a claim upon which relief could be granted. The applicant has appealed, still claiming that it was entitled to a contested case hearing or its functional equivalent. We disagree and, therefore, affirm the trial court.

### I.

The Tennessee Racing Control Act of 1987 became effective on May 7, 1987.[1] Five months later, on October 8, 1987, the City of Memphis conducted a referendum pursuant to Tenn.Code Ann. § 4–36–401 in which over sixty percent of the voters approved conducting horse racing with pari-mutuel wagering within the city.

---

1. *See* Act of April 29, 1987, ch. 311, 1987 Tenn. Pub.Acts 593, codified at Tenn.Code Ann. §§ 4– 36–101, –402 (Supp.1989).

By February, 1988, two applicants were seeking a license to conduct horse racing in Memphis, even though the General Assembly had not yet approved the first members of the Tennessee State Racing Commission ("commission").[2] One of these applicants, Mid–South Indoor Horse Racing, Inc. ("Mid–South"), proposed to conduct hackney pony races at the Mid–South Coliseum using robot jockeys. The moving force behind Mid–South was a prominent Memphis businessman named Charles D. McVean who had made a substantial personal investment in developing the robot jockeys or "super jocks" that would be used for the races.

Shortly after the General Assembly approved the commissioners, Mid–South filed two petitions requesting the commission to grant its application without first adopting regulations governing the licensing process or the conduct of racing. The commission, however, decided that it would not accept formal applications until it promulgated licensing rules. Mid–South filed its formal application on August 1, 1988, the day after the commission's licensing rules became effective.[3]

Several weeks later, the commission met in Memphis to consider the economic feasibility of both applications and to attend a demonstration of the robot jockeys. At that time, the commission determined that Mid–South's application was substantially complete but requested Mid–South to provide additional information concerning several portions of its application and to provide a working model of the robot jockey for testing. As required by Tenn.Code Ann. § 4–36–302(3), the commission also requested the Tennessee Bureau of Investigation to conduct a background investigation of Mid–South and its principals.

In October, 1988, the commission deferred further consideration of the application until Mid–South provided all the requested information and made a robot jock-ey available for testing. The commission also decided that it would schedule a public hearing concerning Mid–South's application within ten days after its expert advised that the robot jockey was "operational and secure."

During the next three months, a dispute arose concerning the adequacy of the information Mid–South had provided with regard to a $1.9 million loan to Mr. McVean and disciplinary action the Chicago Board of Trade had taken against Mr. McVean in 1979. Several members of the commission and the commission's staff requested additional details concerning these matters, but Mr. McVean declined to cooperate, insisting that the matters were not relevant to Mid–South's application for a race track license.

The commission's expert tested a prototype of the robot jockey in early January, 1989 and recommended that it be approved subject to the successful completion of a "program and demonstration plan." Accordingly, the commission decided to meet in Memphis on January 24, 1989 to hold a public hearing concerning Mid–South's application.

On January 9, 1989, Mid–South filed a statement of expenditures with the commission outlining over $8 million in expenditures between 1985 and 1988. The statement, which was neither itemized nor documented, included $805,000 for "professional fees," $678,000 for "promotions and special events," $352,000 for "contributions," and $736,000 in "other" expenditures. It also stated that it did "not include expenditures regarding the 1987 Memphis, Tennessee pari-mutuel referendum."[4]

Numerous persons appeared before the commission on January 24, 1989 to speak in favor of and in opposition to Mid–South's application. One of them, a state senator, told the commission that Mid–South had

---

2. Tenn.Code Ann. § 4–36–201(b) requires the General Assembly to consent to the appointment of five of the commission's seven members.

3. *See* 11 Tenn.Admin.Comp. ch. 1245–3–.01, –.46. The commission filed these rules with the Secretary of State on June 15, 1988, and they became effective on July 30, 1988.

4. Mr. McVean disclosed later that he paid another $249,000 to five organizations to gain passage of the Memphis referendum.

hired him as a consultant to help pass the October, 1987 racing referendum. At the conclusion of the hearing, the commission decided, over Mr. McVean's vehement objections, to defer action on Mid–South's application until February 10, 1989.

On January 26, 1989, a lobbyist named William Don ("Donnie") Walker pleaded guilty in the Criminal Court for Davidson County to an indictment charging him with attempting to bribe a member of the state Senate to vote for the Racing Control Act of 1987. It came out at that time that Mr. McVean had retained Mr. Walker to help pass the Racing Control Act of 1987 and that he had given Mr. Walker a $24,000 check the day before the Senate passed the bill. Mr. McVean denied any wrongdoing with regard to Mr. Walker. He was also quoted in the press as stating that he had paid more than $200,000 between 1987 and 1988 to state and federal politicians, political consultants, and lobbyists to gain passage of the Racing Control Act of 1987 and to obtain a license for Mid–South.

The revelations surrounding Mr. Walker's guilty plea caused several commissioners to question the advisability of proceeding with the February 10 hearing. However, since Mid–South insisted on holding the hearing as scheduled, the commission decided to proceed even though the Walker investigation had not been completed.

Even though Mid–South had requested an advance copy of the TBI's report, the TBI did not provide either the commission or Mid–South with the report until the February 10 meeting. After recessing to enable everyone to read the report, the commission's staff, the commissioners, and one of Mid–South's lawyers questioned the TBI agent who prepared the report. Then the commission permitted one of Mid–South's lawyers to read Mr. McVean's affidavit concerning his dealings with Mr. Walker. Mr. McVean, although present, declined to answer questions about the Walker matter because of the ongoing criminal investigation.

The TBI agent explained that the background investigation was incomplete because of Mr. McVean's lack of cooperation and because its investigation into Mr. McVean's dealings with Mr. Walker had not been concluded. The agent stated that Mid–South and Mr. McVean had not complied fully with its request for detailed information concerning (1) expenditures prior to the Racing Control Act of 1987, (2) expenditures prior to the Memphis referendum, (3) expenditures for the development and promotion of the robot jockey, and (4) the 1979 investigation by the Chicago Board of Trade. The agent also pointed to discrepancies between Mr. McVean's statements and other testimony concerning various payments, including those to Mr. Walker.

The commission deliberated publicly after the evidentiary record was closed. Five commissioners voted against Mid–South's application, while two voted in favor of it. All the commissioners explained the reasons for their votes as they cast them. Those voting against the application did so because they were concerned about the appearance of the integrity of Mid–South's application.[5] They pointed to the fact that the TBI investigation was not complete and to Mid–South's and Mr. McVean's reluctance to make detailed, itemized disclosures concerning various expenditures with regard to the development of the robot jockeys and the passage of the legislation and the ordinance permitting horse racing in Memphis.

On March 31, 1989, the commission denied Mid–South's petition to reconsider its decision. Later, on May 15, 1989, it denied Mid–South's request for a contested case hearing under the Uniform Administrative Procedures Act. Thereafter, Mid–South commenced these review proceedings.

## II.

At the outset, we must identify the proper standard for reviewing the commission's denial of an application for an initial race

---

5. In Tenn.Code Ann. § 4–36–102, the General Assembly directed the commission to see to it that racing events maintained "the appearance and the fact of complete honesty and the highest integrity."

meeting license. Mid–South would have us apply the Uniform Administrative Procedures Act's ("UAPA") standard of review found in Tenn.Code Ann. § 4–5–322 (Supp. 1989). Its reliance on the UAPA is misplaced for two reasons. First, the commission's consideration of applications for initial race meeting licenses is not governed by the UAPA. Second, the Racing Control Act prescribes the standard by which these decisions should be reviewed.

### A.

The General Assembly enacted the UAPA in 1974[6] in response to the proliferation of state boards and agencies. Blank, *Scope of the Tennessee Uniform Administrative Procedures Act,* 6 Mem. St.U.L.Rev. 159, 159 (1976). The growth in the number of agencies had created an "incoherent, and indeed incomprehensible hodgepodge" of procedures and a "very fragmented" judicial review process. *See* Sanford, *The Development of the Tennessee Uniform Administrative Procedures Act,* 6 Mem.St.U.L.Rev. 151, 157 (1976); Sewell, *Judicial Review and the Uniform Administrative Procedures Act,* 6 Mem. St.U.L.Rev. 253, 253 (1976). As reflected in Tenn.Code Ann. § 4–5–103(a), the General Assembly believed that the UAPA would "clarify and bring uniformity to the procedure of state administrative agencies and judicial review of their determination[s]."[7]

The General Assembly also intended that the UAPA would apply to all existing agencies and to all pending administrative proceedings unless they were expressly exempted.[8] Accordingly, the definitions in Tenn.Code Ann. § 4–5–102 are extremely broad and are modified by specific exceptions in Tenn.Code Ann. § 4–5–106. Relying on these broad definitions, the Tennessee Supreme Court has held that the General Assembly's intent to make the UAPA generally applicable is "unmistakably clear." *United Inter–Mountain Tel. Co. v. PSC,* 555 S.W.2d 389, 391 (Tenn.1977).

The definitions and the rules of construction in Tenn.Code Ann. § 4–5–103 have also aided in deciding questions involving the appropriate standard for reviewing agency decisions. In a series of cases handed down soon after the UAPA's enactment, the Supreme Court held that the UAPA's judicial review procedures superseded the pre-existing statutory procedures for reviewing decisions of agencies that were otherwise covered by the UAPA. *Ogden v. Kelley,* 594 S.W.2d 702, 704 (Tenn.1980); *United Inter–Mountain Tel.Co. v. PSC,* 555 S.W.2d at 391; *Metropolitan Government v. Shacklett,* 554 S.W.2d 601, 603–04 (Tenn.1977).

Notwithstanding its intended breadth, the UAPA has not expanded to fill every nook and cranny of administrative practice. Tenn.Code Ann. § 4–5–106 renders all or part of the UAPA inapplicable to several departments and agencies. It is inapplicable to proceedings that do not fit within its adjudicatory or rule-making definitions. *National Health Corp. v. Snodgrass,* 555 S.W.2d 403, 405 (Tenn.1977); *Horne v. Cox,* 551 S.W.2d 690, 691 (Tenn.1977). It is also inapplicable to new proceedings created after 1974 where the General Assembly intended that separate procedures, rather than the UAPA procedures, be used. *Frye v. Memphis State University,* 671 S.W.2d 467, 468 (Tenn.1984).

■ The UAPA's judicial review procedures, including the standard of review in Tenn.Code Ann. § 4–5–322(h), apply only to "preliminary, procedural or intermediate agency action[s] or ruling[s]" or to "final decision[s]" in "contested case[s]." *See* Tenn. Code Ann. § 4–5–322(a)(1). Thus, Tenn.Code Ann. § 4–5–322's standard of review is inapplicable if the agency proceeding sought to be reviewed is not a "contested case."

---

**6.** Act of Mar. 9, 1974, ch. 725, 1974 Tenn.Pub. Acts 945. The original act, as amended is codified at Tenn.Code Ann. § 4–5–101 (1985) through Tenn.Code Ann. 4–5–324 (Supp.1989).

**7.** Similarly, the caption of the 1974 Act states that its purpose was "to provide a system of uniform administrative procedures for the various agencies of the [S]tate of Tennessee; [and] to prescribe the limits and procedures for judicial review of agency decisions."

**8.** *See* Act of Mar. 9, 1974, ch. 725, § 24, 1974 Tenn.Pub.Acts 945, 970.

■ Licensing proceedings will be treated as "contested cases" only if they contain three essential elements. They must be a "proceeding" conducted by an "agency" after the opportunity for a "hearing." *See* Tenn.Code Ann. § 4–5–102(3); Levinson, *Contested Cases Under the Tennessee Uniform Administrative Procedures Act,* 6 Mem.St.U.L.Rev. 215, 215 (1976). Proceedings lacking any of these ingredients are not contested cases.

As explained more fully in Section III of this opinion, the licensing proceeding involved in this case was not a contested case because the commission was not required to afford Mid–South a hearing before acting on its application. Therefore, Mid–South was not entitled to seek judicial review of the commission's decision using Tenn.Code Ann. § 4–5–322 and must look elsewhere for the legal foundation of its appeal.

■ The Racing Control Act of 1987 itself provides part of the answer. While it is, for the most part, silent concerning judicial review of the commission's decisions, Tenn.Code Ann. § 4–36–401(d) provides:

> A determination of the commission as to whether or not to approve a proposed track shall be in the sole discretion of the commission and shall be subject to judicial review only in the event of official misconduct.

This provision entitles an applicant for an initial race meeting license [9] to seek judicial review of the commission's denial of its application. However, the court can only review the commission's action to determine whether it was tainted by the official misconduct of the commission or any of its members or staff.[10]

### B.

The meaning of "official misconduct" in the context of Tenn.Code Ann.

§ 4–36–401(d) is not readily apparent. The legislative history sheds no light on its origin. It has no parallel in Tennessee or in any of the statutes of the over forty states that regulate pari-mutuel wagering.

Our responsibility when called upon to interpret a statute is to identify and then to give effect to the General Assembly's intention. *Westinghouse Elec. Corp. v. King,* 678 S.W.2d 19, 23 (Tenn.1984), *cert. denied,* 470 U.S. 1075, 105 S.Ct. 1830, 85 L.Ed.2d 131 (1985); *Brooks v. Fisher,* 705 S.W.2d 135, 137 (Tenn.Ct.App.1985). We perform our task by construing the entire statute in light of its general purpose, *City of Lenoir City v. State ex rel. City of Loudon,* 571 S.W.2d 297, 299 (Tenn.1978), and by presuming that the General Assembly chose the statute's words deliberately. *Tidwell v. Servomation–Willoughby Co.,* 483 S.W.2d 98, 100 (Tenn.1972). We also give the words their natural and ordinary meaning unless the context in which they are used requires otherwise. *State v. Williams,* 690 S.W.2d 517, 529 (Tenn.1985); *Mercy v. Olsen,* 672 S.W.2d 196, 198 (Tenn. 1984).

Tennessee's statutes do not illumine what type of review the General Assembly had in mind when it enacted Tenn.Code Ann. § 4–36–401(d). The term "official misconduct" rarely appears in the Tennessee Code Annotated, and when it does, it is in contexts that are not useful in this case. While the General Assembly created the statutory offense of "official misconduct" when it enacted the Sentencing Reform Act of 1989,[11] we cannot construe Tenn.Code Ann. § 4–36–401(d) in light of this statute because it was not in existence when the General Assembly enacted the Racing Control Act of 1987.

■ However, Tennessee's courts have recognized the existence of the common

---

**9.** *See* 11 Tenn.Admin.Comp., ch. 1245–3–.02(1). The commission "approves tracks" by approving a track owner's or operator's "application for an initial race meeting license."

**10.** The Racing Control Act of 1987 fails to prescribe when or where these review actions must be filed, and the commission never questioned these aspects of Mid–South's petition. The

Chancery Court for Davidson County has subject matter jurisdiction and venue was proper since the commission's official residence is in Nashville. Mid–South filed its action within two months after the commission adopted the minutes of its February 10, 1989 meeting.

**11.** *See* Tenn.Code Ann. § 39–16–402 (Noncum. Supp.1989).

law offense of "official misconduct" or "misconduct in office" [12] for many years. *State v. Ward*, 163 Tenn. 265, 270, 43 S.W.2d 217, 219 (1931). The offense covers a broad range of conduct, including any wrongful conduct done under the "color of office" that "affects, interrupts, or interferes with the performance of official duty." *Wells v. State*, 174 Tenn. 552, 555, 129 S.W.2d 203, 204 (1939); *State v. Ward*, 163 Tenn. at 269–70, 43 S.W.2d at 219; 3 *Wharton's Criminal Law & Procedure* § 1404 (Anderson ed. 1957).

The offense includes (1) doing an act unlawful in itself (malfeasance), (2) doing an otherwise lawful act in an unlawful manner (misfeasance), and (3) failing to perform an act required by law or the duties of the office (nonfeasance). *Duncan v. State*, 282 Md. 385, 384 A.2d 456, 458 (1978); *State v. Winne*, 12 N.J. 152, 96 A.2d 63, 75 (1953); *Commonwealth v. Bellis*, 508 Pa. 122, 494 A.2d 1072, 1073 (1985). It does not include errors in judgment, *Bunte v. Mayor of Boston*, 361 Mass. 71, 278 N.E.2d 709, 712 (1972), acts done in good faith, *State ex rel. Citizens of Lawrenceburg v. Perkinson*, 159 Tenn. 442, 445, 19 S.W.2d 254, 255 (1929), or the good faith exercise of discretion. *Moran v. State*, 477 N.E.2d 100, 103 (Ind.App.1985).

We presume that the General Assembly was aware of the common law offense of "official misconduct" when it enacted the Racing Control Act of 1987 and that it intended that the scope of Tenn.Code Ann. § 4–36–401(d) should be synonymous with the well-recognized common law meaning of the term. *Lively v. American Zinc Co.*, 137 Tenn. 261, 272–73, 191 S.W. 975, 978 (1917); *Scholze v. Scholze*, 2 Tenn.App. 80, 92 (1925).

Accordingly, we find that Tenn.Code Ann. § 4–36–401(d) empowers the courts to review the commission's decisions with regard to applications for initial race licenses to determine whether they were affected by misfeasance, malfeasance, or nonfeasance of the commission or its staff. The courts should vacate any decision found to be affected by official misconduct with regard to the processing or consideration of the application.

### III.

Mid–South based its petition for judicial review on the commission's refusal to conduct a contested case hearing or its functional equivalent. The petition states a claim upon which relief under Tenn.Code Ann. § 4–36–401(d) can be granted only if the commission is required, by either constitution, statute, or rule, to consider applications for initial race meeting licenses using a contested case hearing procedure. Taking Mid–South's allegations as true, we find that its petition fails to state a claim because the commission is not required to conduct contested case hearings before acting on applications for initial race meeting licenses.

### A.

■ The General Assembly has made plain its intention to provide the commission with the broadest possible authority over horse racing in Tennessee. Characterizing involvement in horse racing as a "privilege," Tenn.Code Ann. §§ 4–36–102 and 4–36–301 vest the commission with "plenary power and jurisdiction over race meetings, and over all persons and things having to do with the operation of such meetings." By its grant of "plenary power," the General Assembly has imbued the commission with complete and unqualified power over horse racing, subject only to constitutional limits. *See Evans v. Metropolitan Utils. Dist.*, 187 Neb. 261, 188 N.W.2d 851, 854 (1971); *Mesa Argo v. R.C. Dove & Sons*, 584 S.W.2d 506, 508 (Tex.Ct. App.1979).

■ While the General Assembly outlined the matters to be considered in granting a race meeting license and the minimum contents of the license application in Tenn.Code Ann. § 4–36–302(1), (2), it left the procedure for considering the applica-

---

**12.** The terms "official misconduct" and "misconduct in office" are synonymous references to the common law offense. *Duncan v. State*, 282 Md. 385, 384 A.2d 456, 458 (1978).

tions to the commission. Tenn.Code Ann. § 4–36–302(2) provides that

> The commission may grant, refuse, suspend or revoke licenses issued pursuant to this chapter in conformance with regulations governing such procedure as provided in this chapter.

We construe this statute to mean that, instead of establishing hearing procedures for the commission as it has done in many other cases, the General Assembly decided to permit the commission to establish its own licensing procedures by regulation.

The commission's licensing regulations prescribe the form and substance of applications for an initial race meeting license. They require that an application be accompanied by an affidavit stating that the applicant is "seek[ing] a grant of a privilege from the State of Tennessee, and the burden of proving the applicant's qualifications rests at all times with the applicant"[13] and that the applicant "accept[s] the risk of adverse public notice, embarrassment, criticism, or other circumstances including financial loss, which may result from action with respect to the application."[14]

The regulations do not require the commission to grant hearings to applicants for initial race meeting licenses. However, one of the commission's rules states:

> The Commission shall provide the applicant for an initial race meeting license an opportunity to make an oral presentation of its application to the Commission before the Commission decides whether to issue a license. This rule does not require that the Commission afford an applicant more than one opportunity to make an oral presentation before the Commission makes its decision.

*See* Tenn.Admin.Comp. ch. 1245–3–.34. The regulations do not give applicants the

right to present or to cross-examine witnesses. Likewise, they do not require the commission to provide applicants with the results of the mandatory TBI background investigations or with any other adverse information about the application.

### B.

■ We turn now to the question of whether state law required the commission to grant Mid–South a contested case hearing before acting on its application for an initial race meeting license. If a contested case hearing requirement exists, it must be found in the UAPA, the Racing Control Act of 1987, or the commission's regulations.

The UAPA does not require administrative agencies to conduct contested case hearings unless the proceeding is one of those included in Tenn.Code Ann. § 4–5–320(c).[15] *See* Kratzke, *A Review of Contested Case Provisions in the Tennessee Uniform Administrative Procedures Act,* 13 Mem.St.U.L.Rev. 551, 552, 554–57 (1983); Blank, *Scope of the Tennessee Uniform Administrative Procedures Act,* 6 Mem.St.U.L.Rev. 159, 166–67 (1976). Proceedings involving initial race meeting license applications are not included in Tenn. Code Ann. § 4–5–320(c). Thus, Mid–South must look beyond the UAPA to support its claim that it is entitled to a quasi-judicial type of hearing.

The Racing Control Act of 1987 does not require the commission to conduct contested case hearings in initial race meeting licensing proceedings. In fact, it contains no procedural requirements at all insofar as initial race meeting licenses are concerned. Instead, Tenn.Code Ann. § 4–36–302(12) leaves the responsibility for promulgating these procedures to the commission.

---

**13.** *See* 11 Tenn.Admin.Comp. ch. 1245–3–.14(3).

**14.** *See* 11 Tenn.Admin.Comp. ch. 1245–3–.14(5).

**15.** Tenn.Code Ann. § 4–5–320(c) requires agencies to provide contested case hearings in proceedings involving the "revocation, suspension, or withdrawal of any license." Its application to the commission's proceedings is far from

certain. A license to participate in horse racing is a privilege, not a right. After October 31, 1990, appeals from the rulings of the judges or stewards pursuant to Tenn.Code Ann. § 4–36–217 are specifically not subject to the UAPA's contested case requirements. *See* Act of Mar. 5, 1990, ch. 684, § 2, 1990 Tenn.Pub.Acts 121.

■ The commission has, by regulation, established the procedures for initial race meeting licensing proceedings. Rule 1245–3–.34 affords applicants such as Mid–South only the "opportunity to make an oral presentation of its application." As the plain meaning of the words themselves suggest, an "oral presentation" is not equivalent to a contested case proceeding or to any other quasi-judicial hearing.

At the most, Rule 1245–3–.34 entitles an applicant for an initial race meeting license to one appearance to persuade the commission to grant its application. It does not require the commission to give the applicant formal notice of its problems or concerns about the application, and it does not require the commission to provide the applicant with an opportunity to present witnesses or to cross-examine persons who present information to the commission.

We have been unable to find any other state law that would have entitled Mid–South to a contested case hearing or its functional equivalent. Since neither the UAPA nor the Racing Control Act nor the commission's regulations require quasi-judicial hearings in proceedings involving applications for an initial race meeting license, we find that state law did not require the commission to provide Mid–South with a contested case hearing before acting on its application.

## C.

■ Both the Due Process Clause of the Fourteenth Amendment and Article 1, Section 8 of the Constitution of Tennessee protect fundamental property and liberty interests from abridgement under color of state law.[16] Thus, even if the Racing Control Act of 1987 does not specifically require the commission to conduct a contested case hearing, Mid–South could still be entitled to the equivalent of a contested case hearing if it has a constitutionally protected interest in an initial race meeting license.

■ To be entitled to procedural due process protection, a property interest must be more than a "unilateral expectation" or an "abstract need or desire." It must be a "legitimate claim of entitlement" created and defined "by existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

■ Whether an applicant has a legitimate claim of entitlement to a license depends largely upon the extent to which the licensing statutes restrict the licensing agency's discretion to deny licenses to applicants who meet minimum eligibility requirements. *Jacobson v. Hannifin*, 627 F.2d 177, 179–80 (9th Cir.1980). Where state law gives the licensing agency broad discretion to grant or to deny license applications in a closely regulated activity, the applicants for an initial license do not have a constitutionally protected claim of entitlement. *Erdelyi v. O'Brien*, 680 F.2d 61, 63 (9th Cir.1982); *Kansas Racing Management, Inc. v. Kansas Racing Comm'n*, 244 Kan. 343, 770 P.2d 423, 433–34 (1989).

■ Ownership of a race track where pari-mutual wagering is permitted is not a fundamental or natural right. It is a privilege conferred by the state. *Medina v. Rudman*, 545 F.2d 244, 250–51 (1st Cir. 1976), *cert. denied*, 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 177 (1977); *State v. Rosenthal*, 93 Nev. 36, 559 P.2d 830, 835, *appeal denied*, 434 U.S. 803, 98 S.Ct. 32, 54 L.Ed.2d 61 (1977); *Lasky v. Van Lindt*, 115 Misc.2d 259, 453 N.Y.S.2d 983, 986 (1982). Accordingly, all the courts that have addressed the issue have held that applicants seeking a license to engage in some gambling-related activity do not have a constitutionally protected right to a license if the licensing statutes do not require the issuance of a license to anyone meeting minimum eligibility requirements. *Jacobson v. Hannifin*, 627 F.2d at 180; *Medina v. Rudman*, 545 F.2d at 251; *Kan-*

---

**16.** The "law of the land" provision in Tenn. Const. art. 1, § 8 is synonymous with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Dearborne v.*

*State*, 575 S.W.2d 259, 262 (Tenn.1978); *Daugherty v. State*, 216 Tenn. 666, 674, 393 S.W.2d 739, 743 (1965), *cert. denied*, 384 U.S. 435, 86 S.Ct. 1601, 16 L.Ed.2d 671 (1966).

sas *Racing Management, Inc. v. Kansas Racing Comm'n,* 770 P.2d at 433–34; *State v. Rosenthal,* 559 P.2d at 835; *Lasky v. Van Lindt,* 453 N.Y.S.2d at 986; *Keystone Raceway Corp. v. State Harness Racing Comm'n,* 405 Pa. 1, 173 A.2d 97, 100–02 (1961).

The Racing Control Act of 1987 vests the commission with "plenary power" to regulate every aspect of pari-mutuel wagering in Tennessee. It contains broad, subjective licensing criteria and does not require the commission to issue an initial race meeting license even if the applicant meets all the statutory requirements. Tenn.Code Ann. § 4–36–302(12) states that the commission "may"—as opposed to "shall"—issue licenses, and Tenn.Code Ann. § 4–36–401(d) provides that these decisions are "in the sole discretion of the commission."

Mid–South has no legitimate claim to an initial race meeting license under state law. Accordingly, it does not have a constitutionally protected property right that requires the commission to grant it the equivalent of a contested case hearing before acting on its license application.

### IV.

Mid–South also asserts that the commission failed to make adequate findings of fact and conclusions of law. We disagree. Given the unique standard of review in cases of this sort, the commission's findings were adequate.

The UAPA's requirements with regard to findings of fact and conclusions of law in Tenn.Code Ann. § 4–5–314(c) do not apply to the commission's consideration of applications for initial race meeting licenses because these proceedings are not contested cases. The Racing Control Act of 1987 contains its own requirements with regard to the commission's findings. Tenn.Code Ann. § 4–36–302(14) provides:

> The commission shall publicly state its reasons for refusing, suspending or revoking a license granted by it, and such reasons shall be included in the minute book of the commission and such book shall be open to public inspection during

all regular office hours of the commission.

*See also* Tenn.Code Ann. § 4–36–210.

At the conclusion of its February 10, 1989 meeting, the commission deliberated in public, and each commissioner, in turn, announced his or her vote on Mid–South's application and then explained the reasons for the vote. The commission later directed that a verbatim transcript of the proceedings be prepared. At its March 13, 1989 meeting, the commission unanimously adopted the transcript as the official minutes of its February 10, 1989 meeting.

We find that the verbatim transcript adopted by the commission as the minutes of its February 10, 1989 meeting complies fully with Tenn.Code Ann. §§ 4–36–210, 4–36–302(14). It fairly appraises the reader of the reason for the commission's and each individual commissioner's decision. Given the uniquely narrow standard of review in Tenn.Code Ann. § 4–36–401(d), nothing more is required

### V.

We find that Mid–South's petition for judicial review fails to state a claim upon which relief can be granted because Mid–South did not have a right to a contested case hearing or its equivalent before the commission acted on its application for an initial race meeting license. Therefore, we affirm the trial court and remand the case for whatever further proceedings may be required. We tax the costs of the appeal to Mid–South Indoor Horse Racing, Inc. and its surety for which execution, if necessary, may issue.

TODD, P.J., and CANTRELL, J., concur.